694 P.2d 198

**SALT RIVER PROJECT AGRICULTUR-
AL IMPROVEMENT AND POWER
DISTRICT, Plaintiff-Appellant,**

v.

**WESTINGHOUSE ELECTRIC CORPO-
RATION, a Pennsylvania
corporation, Defendant-Appellee.**

**No. 17233–PR.**

Supreme Court of Arizona,
En Banc.

Dec. 27, 1984.

Reconsideration Denied Feb. 13, 1985.

Black, Robertshaw & Copple by Richard A. Black, Philip C. Thorpe, Phoenix, for appellant.

Lewis & Roca, by Douglas L. Irish, Paul G. Ulrich, Edward M. Lewis, Phoenix, for appellee.

Jaron B. Norberg, Phoenix, for amicus curiae.

FELDMAN, Justice.

Salt River Project (SRP) petitions this court to review the opinion of the court of appeals (*Salt River Project v. Westinghouse Electric Corp.*, 143 Ariz. 437, 694 P.2d 267 (1983)), which affirmed a partial summary judgment in favor of Westinghouse Electric Corporation (Westinghouse). We have jurisdiction, Ariz. Const., art. 6 § 5(3), and granted review (Rule 23, Ariz.R. Civ.App.P., 17A A.R.S.) because no Arizona decision controls the important issues raised. These issues involve the scope of the tort liability of a commercial seller to a commercial buyer. We must decide:

1. What is the basis upon which to determine whether tort law or contract law is to govern claims arising from malfunction of a product?

2. Does the doctrine of strict liability in tort apply where the purchaser of the product is a commercial enterprise able to bargain for loss allocation and capable of allocating the risk to its own customers?

3. Under what conditions, if at all, may a buyer and seller contract for a waiver of tort liability?

### FACTS

SRP generates over seven billion kilowatt hours of electricity per year, making it Arizona's second largest electric utility company. In 1970 SRP purchased a gas turbine generator unit (model W–501) from Westinghouse to install at the Kyrene Power Plant in Tempe. The unit, known as Kyrene-4, included a Westinghouse "P–50 computer" which automatically started and operated the generator. The unit was designed as a "peak load unit" to provide additional electricity during "peak demand periods." In 1970 there was a great demand for gas units and some competition among suppliers. Westinghouse believed that its model offered a number of advantages; SRP evidently agreed, and Kyrene-4 was purchased and accepted for commercial operation in December 1971.

In April 1972 SRP complained to Westinghouse about a number of problems with the unit, including frequent "computer malfunctions" of the P–50. Westinghouse had received similar complaints from other customers. SRP suggested that "an improvement could be made if there was a means of operating the turbine manually." On January 31, 1973 a Westinghouse special sales representative, Dick T. Quisenberry, wrote to SRP that Westinghouse was developing a device "that would permit manual operation of ... gas turbine plants during maintenance of the [P–50] control computer." The price for the new device was to be $15,000. Interested customers were told that "orders will be accepted with shipment priorities based on order dates" and that information describing the device (later labelled a "Local Maintenance Controller" or LMC) would be forthcoming. On March 2, 1973 SRP sent its standard purchase order to Westinghouse. The back of the purchase order listed SRP's pre-printed "Terms and Conditions of Purchase Order." These included the following:

1. Acceptance of Purchase Order .... Acceptance of this Purchase Order must be made on its exact terms and if additional or different terms are proposed by Seller such response will constitute a counter-offer, and no contract shall come into existence without Buyer's written assent to the counter-offer. Buyer's acceptance or payment for material shipped shall constitute acceptance of such material subject to the provisions herein, only, and shall not constitute acceptance of

any counter-offer by Seller not assented to in writing.

On March 15, 1973 Westinghouse assigned a general order (GO) number to SRP's purchase order. The Westinghouse response to SRP's form purchase order was a standardized acceptance form of its own, stating in bold print: "Your order has been entered as our general order (GO) number as shown above." The form referred the recipient to the reverse side for Westinghouse's "terms and conditions" of the sale. The printed language on the reverse side included the following:

### TERMS AND CONDITIONS

*The conditions stated below shall take precedence over any conditions which may appear on your standard form,* and no provisions or condition of such form except as expressly stated herein, shall be binding on Westinghouse. (Emphasis supplied.)

\* \* \* \* \* \*

WARRANTY—... Westinghouse warrants that the products sold hereunder shall be of the kind and quality described in this quotation and shall be free of defects in workmanship or materials ... THIS WARRANTY ... IS EXCLUSIVE AND IN LIEU OF ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR PURPOSE, OR OTHER WARRANTY OF QUALITY, WHETHER EXPRESS OR IMPLIED. (Emphasis in original.)

LIMITATION OF LIABILITY—Neither party shall be liable for special, indirect, incidental or consequential damages. The remedies of the Purchaser set forth herein are exclusive, and the liability of Westinghouse with respect to any contract or sale or anything done in connection therewith, whether in contract, in tort, under any warranty or otherwise, shall not, except as expressly provided herein, exceed the price of the product or part on which such liability is based.

SRP received this document on March 20, 1973. On April 20, 1973 Quisenberry sent a letter to SRP stating that the LMCs were scheduled for shipment in late August and that there would be no change in the price.

The SRP version of these negotiations is contained in an affidavit by J.O. Rich, SRP's Assistant General Manager:

2. Kyrene Unit No. 4 was purchased on the 8th day of April, 1970, at a purchase price of $4,517,815.00.

3. Due to repeated and consistent problems with the P–50 computer which was the sole means of starting the Kyrene No. 4 Turbine ..., the Salt River Project was not able to obtain satisfactory performance from said Kyrene No. 4 Unit.

4. Salt River Project complained on several occasions to Westinghouse of the poor performance of the P–50 computer. Due to the extremely technical information needed to design any start-up control unit and the fact that Westinghouse refused and continues to refuse to divulge that technical data to Salt River Project, the Salt River Project could not obtain an alternative to the P–50 computer from any source other than Westinghouse.

\* \* \* \* \* \*

7. Due to the fact that the Salt River Project had purchased a $4,517,815.00 gas turbine unit Model W–501, which it could not obtain satisfactory benefit from without the purchase of the LMC to correc the all too frequent malfunctions of the P–50 computer, the Salt River Project had no alternative and, thus, had no power to bargain or negotiate with Westinghouse with regard to price or terms relative to the purchase of the LMC. Salt River Project would have, if forced, paid many times the price charged by Westinghouse for the LMC because the Salt River Project in fact had purchased two Model W–501 turbine units, neither of which would function properly without the new LMC. Salt River Project was thus in the position of having $9,035,630 worth of equipment which needed Westinghouse designed and offered improvement.

8. Management of the Salt River Project purchased the LMC for Kyrene Unit # 4 as a result of the offer of Quisenberry of January 31, 1973. ... As far as I have been able to determine, none of the terms of the acknowledgment were negotiated or brought to the attention of the management of the Salt River Project by the salesman Quisenberry or any other person.

The LMC was delivered to and installed in Kyrene-4 during February 1974. Westinghouse employees were involved in the installation and testing of the LMC and its integration into the unit. On May 16, 1976 the rotating blades in sections one through four of the Kyrene-4 gas turbine unit were destroyed in an accident. Damages were ascertained to be in excess of $1.9 million. SRP alleges that the accident was caused by an explosion and fire resulting from a malfunction in the LMC and that the malfunction was due to an unreasonably dangerous defect in the design of the LMC unit. In the alternative, SRP alleges that Westinghouse breached an implied warranty of fitness.

## THE UNIFORM COMMERCIAL CODE—BREACH OF WARRANTY

■ There was some dispute below concerning what constituted the offer and what constituted the acceptance under these facts. We adopt and approve the court of appeals' resolution of this issue. The Quisenberry letter of January 31, 1973 did not constitute a firm offer but merely invited a purchase offer from SRP. About a month later SRP submitted its offer replete with standard form "terms and conditions." Westinghouse's acknowledgment, containing its own standard "terms and conditions," served as the contract once SRP had accepted the LMC device nearly a year later without protesting any of the terms in the Westinghouse boilerplate.

See A.R.S. §§ 47–2204, 2206(A), 2207 (5 Ariz.Leg.Serv. 238 (1984)). Westinghouse prevails in this "battle of forms" because, under the UCC, it is recognized that "merchants" may merely exchange forms without engaging in actual negotiations concerning a knowledgeable allocation of risks. See J. White & R. Summers, *Uniform Commercial Code* § 1–2 (1972).

SRP concedes the effectiveness of these provisions but asserts, nevertheless, that it should be able to avoid the limitations of express and implied warranties delineated in Westinghouse's boilerplate "terms and conditions" because, under the circumstances presented here, these terms are "unconscionable." *See* A.R.S. § 47–2719(C) (5 Ariz.Leg.Serv. 263 (1984)).[1] The court of appeals aptly summarized the state of the law regarding the effectiveness of Westinghouse's warranty limitations:

Evidence showing that one party failed to negotiate a better deal than actually achieved does not, as a matter of law, establish that the agreement of the parties was unconscionable.

*Salt River Project v. Westinghouse Electric Corp.*, 143 Ariz. at 447, 694 P.2d at 277.

■ Although a commercial purchaser is not doomed to failure in pressing an unconscionability claim, *see Ford Motor Co. v. Tritt*, 244 Ark. 883, 430 S.W.2d 778 (1968); *Wilson Trading Corp. v. David Ferguson, Ltd.*, 23 N.Y.2d 398, 297 N.Y.S.2d 108, 244 N.E.2d 685 (1968), findings of unconscionability in a commercial setting are rare. J. White & R. Summers, *supra*, at 385–86. We approve the court of appeals' resolution of the unconscionability issue as to the warranty disclaimer; both the trial court and the court of appeals correctly concluded that SRP was not entitled to any relief under the UCC. However, because we conclude that SRP's rights in tort are not

---

1. A.R.S. § 47–2719(C) states:
Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not.
*See also* A.R.S. §§ 47–2302, 47–2316(D) (5 Ariz. Leg.Serv. 240, 243 (1984)).

governed by UCC provisions, including those regarding disclaimer and unconscionability, we disapprove the court of appeals' extension of its warranty rationale to the tort liability issue.

## LIABILITY IN TORT

SRP contends that even if relief is unavailable under the UCC, it still may proceed against Westinghouse, under the theory of strict tort liability, for the damage to SRP's property caused by the alleged defect in the LMC. Westinghouse contends, to the contrary, that SRP is an economic equal with bargaining power equivalent to that of Westinghouse and therefore has no cause of action under § 402A of the Restatement (Second) of Torts. Westinghouse advances two reasons for this: first, the "terms and conditions" in the standardized form expressly disclaim any liability in tort exceeding the price of the LMC; second, the doctrine of strict tort liability does not apply to purchasers such as SRP. The trial court and the court of appeals agreed with Westinghouse. Stating that "[w]e must not create rules of liability which displace those of the UCC" (at 273), the court of appeals held that

> [t]he rule of strict product liability shifts the risk by resort to tort law where a statutory scheme does not adequately protect *ordinary consumers* who do not deal in a commercial setting from a position of relative equal bargaining strength. In this case, the statutory principles of sales warranties work well. Accordingly we will not displace the statutory scheme of the UCC.

*Id.* (citations omitted).

The issue presented is at the intersection of tort and commercial contract law, implicating principles of both fields. Although the UCC and strict liability in tort may parallel one another, they express different underlying public policy considerations. *See Caruth v. Mariani,* 11 Ariz.App. 188, 190, 463 P.2d 83, 85 (1970). Thus, whether SRP may invoke the tort doctrine of strict liability or is barred by UCC provisions turns largely upon a determination of

whether its claim is a tort claim governed by tort law, or a contract claim governed by the UCC, or partly one and partly the other. We turn to this question.

## THE TEST TO DETERMINE THE EXISTENCE OF A TORT CLAIM

Several basic policy justifications have proved convincing to courts which have accepted the doctrine of strict liability in tort. One acknowledged by this court is "that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them." *O.S. Stapley Co. v. Miller,* 103 Ariz. 556, 559, 447 P.2d 248, 251–52 (1968), quoting Restatement (Second) of Torts § 402(A), comment *c*. This policy rests, in part, on a "cost-shifting rationale," *Salt River Project v. Westinghouse Electric Corp.,* at 271, that merchants and manufacturers have the capacity to internalize the costs of accidental losses and distribute them among the many consumers who purchase their products. *Seely v. White Motor Co.,* 63 Cal.2d 9, 45 Cal.Rptr. 17, 23, 403 P.2d 145, 151 (1965); *see also* W. Prosser & W. Keeton, *The Law of Torts* § 98 at 693 (5th ed. 1984). Another reason advanced for the imposition of strict liability in tort is that the social goal of product safety is better fulfilled by strict liability theory than by traditional negligence theory. *Markle v. Mulholland's, Inc.,* 265 Or. 259, 268–70, 509 P.2d 529, 532–34 (1973). An overriding policy consideration, therefore, is that of safety in the marketplace. Strict liability "is not based upon traditional concepts of fault," *Reader v. General Motors Corp.,* 107 Ariz. 149, 154, 483 P.2d 1388, 1393 (1971), but is imposed in an attempt to make the products safer.

> The "prophylactic" factor of preventing future harm has been quite important in the field of torts. The courts are concerned not only with compensation of the victim, but with admonition of the wrongdoer. When the decisions of the courts become known, and defendants realize that they may be held liable, there is of course a strong incentive to prevent the

occurrence of the harm. Not infrequently one reason for imposing liability is the deliberate purpose of providing that incentive .... [T]he manufacturer who is made liable to the consumer for defects in a product will do what can be done to see that there are no such defects.

W. Prosser & W. Keeton, *supra*, § 4 at 25–26 (footnotes omitted). Thus, preventing accidents by deterring the distribution of unsafe products is one of the prime goals of tort law.

■■■ A basic policy of contract law, on the other hand, is to preserve freedom of contract and thus promote the free flow of commerce. *See* UCC § 1–102, Official Comment 2. This policy is best served when the commercial law permits parties to limit the redress of a purchaser who fails to receive the quality of product he expected. *See Moorman Manufacturing Co. v. National Tank Co.*, 91 Ill.2d 69, 74, 61 Ill.Dec. 746, 435 N.E.2d 443, 448 (1982). When a defect renders a product substandard or unable to perform the functions for which it was manufactured, the purchaser's remedy for disappointed commercial expectations is through contract law. *Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.*, 652 F.2d 1165, 1172 (3rd Cir.1981).

■■■ Division One of the Arizona Court of Appeals has aptly summarized the difference between tort and contract:

[T]he rationale for making a distinction is that traditional contract remedies are designed to redress loss of the benefit of the bargain while tort remedies are designed to protect the public from dangerous products.

*Arrow Leasing Corp. v. Cummins Arizona Diesel, Inc.*, 136 Ariz. 444, 447, 666 P.2d 544, 547 (App.1983). To determine whether contract or tort law applies in a specific case, the court must consider the facts of the case, "bearing in mind the purposes of tort law recovery as contrasted with contract law." *Id.* at 448, 666 P.2d at 548. We agree with the court of appeals in *Arrow Leasing Corp. v. Cummins Arizona Diesel, Inc., supra,* that no all-inclusive

rule governs this consideration. The cases and relevant literature indicate that three interrelated factors should be analyzed: the nature of the product defect that caused the loss to the plaintiff, the manner in which the loss occurred, and the type of loss for which the plaintiff seeks redress. *See Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.*, 652 F.2d at 1173; *Cloud v. Kit Manufacturing Co.*, 563 P.2d 248, 251 (Alaska 1977); *Moorman Manufacturing Co. v. National Tank Co.*, 91 Ill.2d at 81–82, 61 Ill.Dec. 752, 435 N.E.2d at 449.

### 1. NATURE OF THE DEFECT

■■■ Under the Restatement's formulation of strict liability in tort, manufacturers and sellers are liable for damages caused by "any product in a defective condition unreasonably dangerous to the user or consumer or to his property." Restatement (Second) of Torts § 402A. Under negligence principles, manufacturers and sellers are liable if they knowingly provide a product that is likely to be dangerous. *Id.* § 388. Thus, the type of product that will trigger tort liability is one which is defective in a way that poses an unreasonable danger to those who use or consume it. *Byrns v. Riddell, Inc.*, 113 Ariz. 264, 550 P.2d 1065 (1976); *O.S. Stapley Co. v. Miller, supra; Hohlenkamp v. Rheem Manufacturing Co.*, 134 Ariz. 208, 655 P.2d 32 (App.1982); *Shell Oil Co. v. Gutierrez*, 119 Ariz. 426, 581 P.2d 271 (App. 1978). In contrast, the type of product defect contemplated by the UCC is a qualitative one; the Code provides that a merchant impliedly warrants that his goods are "merchantable," that is, "fit for the ordinary purposes for which such goods are used." A.R.S. § 47–2314(B)(3) (5 Ariz.Leg. Serv. 243 (1984)). *See, e.g., Flory v. Silvercrest Industries, Inc.*, 130 Ariz. 15, 633 P.2d 424 (App.1980); *McCormick v. Ornstein*, 119 Ariz. 352, 580 P.2d 1206 (1978). Thus, a Code plaintiff claiming a breach of implied warranty must prove that the goods he received were defective in that they were not fit for their ordinarily intend-

ed use; he need not bear the further burden of proving, as must the tort plaintiff, that the product posed an unreasonable danger of causing injury to person or property. *See* Note, *Should Contract or Tort Provide the Cause of Action When a Plaintiff Seeks Recovery Only for Damage to the Defective Product Itself,* 10 N.Ky.L.Rev. 489, 506–07 (1983).

■ Two cases from the Third Circuit Court of Appeals have addressed this distinction between the tort and UCC formulations in reaching different results depending on the hazardous or non-hazardous nature of the defective product at issue. In *Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co., supra,* a defective front-end loader caught fire and was destroyed. In allowing the buyer to recover his property damages under § 402A because of the "highly dangerous" nature of the fire, 652 F.2d at 1174, the Third Circuit commented:

> The gist of a products liability tort case is not that the plaintiff failed to receive the quality of product he expected, but that the plaintiff has been exposed, *through a hazardous product,* to an unreasonable risk of injury to his person or property. On the other hand, contract law, which protects expectation interests, provides the appropriate set of rules when an individual wishes a product to perform a certain task in a certain way, or expects or desires a product of a particular quality so that it is fit for ordinary use.

*Id.* at 1169 (footnotes omitted; emphasis supplied). Earlier, the same court had ruled that the UCC was the proper and exclusive mechanism for redress where the plaintiff had incurred damages as a result of making an unuseable motion picture with severely scratched film supplied by the defendant. *Posttape Associates v. Eastman Kodak Co.,* 537 F.2d 751 (3rd Cir.1976). The court noted the "superiority of § 402A" to compensate for personal injury or property damage from a defective and unreasonably dangerous product, *id.* at 755, but concluded that it was not applica-

ble where, as in the case before it, "the damages are consequential and arise from a *non-dangerous* impairment of quality of the product." *Id.* (emphasis supplied). Where the potential for danger to person or property is absent, tort principles need not be invoked because the safety incentive policy of tort liability is not implicated. Thus, where the defect involves only the quality of the product and presents no unreasonable danger to person or property, the UCC remedy is ordinarily exclusive.

### 2. MANNER IN WHICH THE LOSS OCCURRED

Though the manner in which loss occurs will not often be determinative, in a particular case it may be relevant. In discussing this factor, courts have distinguished between losses resulting from a sudden accident and those occurring from a slow process of deterioration. *See Cloud v. Kit Manufacturing Co.,* 563 P.2d at 251; *Arrow Leasing Corp. v. Cummins Arizona Diesel, Inc.,* 136 Ariz. at 448, 666 P.2d at 548; *Trans Word Airlines, Inc. v. Curtiss-Wright Corp.,* 1 Misc.2d 477, 481, 148 N.Y. S.2d 284, 290 (1955). These courts have allowed tort recovery only in instances where an "accident" has occurred and have relegated the plaintiff to commercial remedies where the property loss was of a non-accidental nature and where, for example, there was "no evidence of violence, fire, collision with external objects, or other calamity." *Northern Power & Engineering Corp. v. Caterpillar Tractor Co.,* 623 P.2d 324, 329 (Alaska 1981). *See also* Note, *Economic Loss in Products Liability Jurisprudence,* 66 Colum.L.Rev. 917, 918 (1966).

■ We note that this portion of the analysis must be approached with a degree of circumspection, for adherence to the safety incentive policy of strict tort liability may demand that certain losses be recoverable in tort even though only the result, and not the process, may be described as an accident or calamity. A product may pose an unreasonable danger to its user, even though no sudden accident has oc-

curred, where, for example, it emits a toxic substance or its harmful effects manifest themselves only after a period of many years. In such instances, the other factors in the analysis—the nature of the defect and the type of loss that occurred—assume greater importance and will weigh more heavily in the determination of the appropriate rule of law. However, in most instances the accident/non-accident classification will be helpful, if only to assist in the differentiation between a tort defect and a commercial defect. The occurrence of a sudden calamity or an extraordinary event—an "accident"—ordinarily marks the invocation of tort law, while the commercial code comes into play more readily when a loss is the direct result of the product's early deterioration or other failure to perform in conformity with the commercial agreement. *See* Franklin, *When Worlds Collide: Liability Theories and Disclaimers in Defective-Product Cases,* 18 Stan.L.Rev. 974, 995 (1966).

### 3. TYPE OF LOSS OR DAMAGE

Although courts have differed on precisely where to draw the line between UCC and tort in assessing different types of loss, we can discern some general principles. A few hypotheticals will be useful to illustrate the problems to be addressed in determining whether certain types of loss should be recoverable in tort or under the UCC. In all five hypotheticals, a new LMC unit with an unreasonably dangerous and undiscovered defect was installed in the previously purchased turbines. Subsequently the LMC malfunctioned, causing the losses and damage illustrated below.

At Plant # 1, the defect caused the LMC to malfunction at a time when the plant engineer was aloft on a catwalk inspecting one of the turbines controlled by the LMC. The force of the resulting explosion (accident) knocked the engineer to the floor, injuring him.

At Plant # 2, the same malfunction affected only one turbine, which accidently caught on fire and was completely destroyed.

At Plant # 3, the defect caused the LMC to malfunction and burn. The fire department responded quickly, so none of the turbines or other property located near the LMC was damaged in the accident.

At Plant # 4, the plant engineer discovered the defect in the LMC and was able to shut down the turbines and replace the LMC before any damage occurred. However, the LMC replacement cost to SRP is $50,000, including shutdown, start-up and testing costs.

At Plant # 5, during a peak demand period, the LMC malfunctioned and failed to start all four of the gas turbines. The plant was down for twenty-four hours. As a result, SRP could not deliver electricity to its numerous commercial and residential users. SRP not only lost all the profits anticipated from the sales to those consumers but must replace the LMC and faces lawsuits by some of its large commercial users.

■■■ By unanimous authority, the personal injuries suffered by the engineer at Plant # 1 and the property damage at Plant # 2 are recoverable in a strict tort liability action. Restatement (Second) of Torts § 402A. The defect was unreasonably dangerous to person or property and caused accidental damage to other property.

■■■ There is a split in authority on whether to allow recovery in tort for physical harm to or destruction of only the defective product itself, the situation at Plant # 3. The defect was unreasonably dangerous and caused an accident. However, the only "loss" was the product itself. No person or other property was damaged. Cases which have held such losses not recoverable in tort have done so on the rationale that the aggrieved buyer has lost only the benefit of his bargain, that the loss is purely economic, and that the buyer therefore may seek redress only through the UCC. *See Hawkins Construction Co. v. Matthews Co.,* 190 Neb. 546, 209 N.W.2d 643 (1973); *Mid-Continent Aircraft Corp. v. Curry County Spraying Service,* 572

S.W.2d 308 (Tex.1978). Courts which have allowed tort recovery for such losses generally have done so on a policy basis, reasoning that a manufacturer's responsibility to market safe products should not depend on the fortuity of whether the full extent of the unreasonable danger posed—personal injury or damage to property other than the defective product—has actually occurred. *Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.*, 652 F.2d at 1172–73; *Cloud v. Kit Manufacturing Co.*, 563 P.2d at 250–51; *Russell v. Ford Motor Co.*, 281 Or. 587, 594–96, 575 P.2d 1383, 1386–88 (1978); *Berg v. General Motors Corp.*, 87 Wash.2d 584, 592, 555 P.2d 818, 822 (1976). It is in the realm of this direct property damage that we believe the unreasonably dangerous nature of the product defect and the occurrence of the loss in a sudden, accidental manner would tip the balance in favor of strict tort liability even though the damage fortuitously was confined to the product itself. *Russell v. Ford Motor Co., supra; Berg v. General Motors Corp., supra.* However, where the loss to a defective product alone occurs in such a way as to pose no unreasonable danger of harm to person or other property, then UCC remedies will generally be appropriate and exclusive for recovery of the damage to the defective product itself. *See Posttape Associates v. Eastman Kodak Co., supra.*

The majority rule holds that economic losses such as those at Plants # 4 and # 5 are not recoverable in tort. There was no accident; the danger remained latent, even though the loss is attributable to a defect that could have become unreasonably dangerous. The loss is only economic in nature. The rule denying recovery in tort for such losses had its genesis in *Seely v. White Motor Co., supra,* and has been applied by courts to deny tort recovery for repair and replacement costs, as well as lost profits. *See Arrow Leasing Corp. v. Cummins Arizona Diesel, Inc., supra; Beauchamp v. Wilson,* 21 Ariz.App. 14, 515 P.2d 41 (1973); *see also Southwest Forest Industries, Inc. v. Westinghouse Electric Company,* 422 F.2d 1013 (9th Cir.), *cert. denied,* 400 U.S. 902, 91 S.Ct. 138, 27 L.Ed.2d 138 (1970).

 The rule that the UCC remedy is exclusive in this type of situation is not without its critics, however:

> By what is apparently a majority of jurisdictions, the courts seek to restrict warranty liability to recovery for commercial or economic loss and to restrict strict tort to recovery for damage claims to person or property. This distinction has an appealing charm of simplicity but it cannot stand the test of pragmatism or logic.

3 R. Anderson, *The Uniform Commercial Code,* § 2–314:50 at 156–57 (3d ed. 1983) (footnote omitted). *See also* Apel, *Strict Liability: Recovery of "Economic Loss,"* 13 Idaho L.Rev. 29, 42–44 (1976); Franklin, *supra,* at 983–85. Rather than adopting the majority rule as a blanket disallowance of tort recovery for economic losses, we think the better rule is one which examines the loss in light of the nature of the defect that caused it, the manner in which it occurred, and the nature of any other contemporaneous losses. We agree with the Oregon Supreme Court that

> [t]he premise of [the seller's] liability also controls its extent. The loss must be a consequence of the kind of danger and occur under the kind of circumstances, 'accidental' or not, that made the condition of the product a basis for strict liability. This distinguishes such a loss from economic losses due only to the poor performance or the reduced resale value of a defective, even a dangerously defective, product.

*Russell v. Ford Motor Co.,* 281 Or. at 595, 575 P.2d at 1387.

 Where economic loss, in the form of repair costs, diminished value, or lost profits, is the plaintiff's only loss, the policies of the law generally will be best served by leaving the parties to their commercial remedies. Where economic loss is accompanied by physical damage to person or other property, however, the parties' interests generally will be realized best by the imposition of strict tort liability. If the

only loss is non-accidental and to the product itself, or is of a consequential nature,[2] the remedies available under the UCC will govern and strict liability and other tort theories will be unavailable. The perfect example of this is *Posttape Associates v. Eastman Kodak Co., supra,* where scratches on film purchased by Posttape from Kodak made the motion picture shot on the film commercially worthless. However, if the defect presented a real danger of harm to person or other property, an "accident" did occur, the damage was of the type recognized as "tort damage" (harm to person or other property), or if some combination of these factors preponderates, tort remedies will be available. When they are, the plaintiff will be able to recover for all damages—personal injury, property damage to other property, property damage to the product itself, and all consequential damage generally allowed in tort actions. *See Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co., supra; Cloud v. Kit Manufacturing Co., supra.*

Unfortunately, few cases conform neatly to an "all or nothing" configuration. Each case must be examined to determine whether the facts preponderate in favor of the application of tort law or commercial law exclusively or a combination of the two. In weighing the evidence to make this determination, the trial court should examine the three factors—1) the nature of the product defect, 2) the manner in which the loss occurred, and 3) the type(s) of loss or damage that resulted. If the court determines that tort principles are appropriate in the circumstances, the plaintiff may rely on strict liability under § 402A, negligence, or any other applicable tort theory.

█ We turn now to apply the foregoing analysis to the facts in the case at bench. First, SRP's major claim is for damage to its turbines incurred in an accident allegedly caused by a malfunction of the LMC unit. SRP claims damages in excess of $1.9 million for the turbine blades destroyed and $50,000 in lost profits and expenses. The alleged defect in the LMC may have exposed SRP to a risk of severe injury to its other property or its employees. In its summary of the pertinent facts in this case, the court of appeals stated that "an explosion and fire occurred", at 270; therefore, because we are reviewing the grant of summary judgment, we assume that the defect here is not merely a commercial defect or "non-dangerous impairment of quality," *Posttape Associates v. Eastman Kodak Co.,* 537 F.2d at 755, but the result of an unreasonably dangerous defect in a product supplied by the defendant. If so, this is precisely the sort of defect addressed by § 402A, for the catastrophic destruction by fire and explosion of several blades of SRP's gas turbine unit would probably reflect a danger to person or property beyond that which the ordinary purchaser of an LMC would contemplate. *See* Restatement (Second) of Torts § 402A, comment *i.* On this basis, then, strict tort liability would provide a more appropriate frame of reference than the UCC.

Second, the manner in which SRP's loss arose also points toward the application of strict tort liability here. The loss occurred by fire—in a sudden accident—not by wearing out, deterioration, or failure to perform or operate. Further, the accident was of a type which could endanger persons and "other property." Thus, it is the type of event for which tort law provides the proper rationale. *See Arrow Leasing Corp. v. Cummins Arizona Diesel, Inc.,* 136 Ariz. at 448, 666 P.2d at 548; *Cloud v. Kit Manufacturing Co.,* 563 P.2d at 251.

Third, SRP claims two types of loss: the major claim of nearly $2 million for property damage and a claim for $50,000 in the nature of economic loss. Whether the major item of property damage is classified as a loss to other property of the plaintiff or a loss only to the defective product itself,

---

**2.** Consequential damages are those damages that are an economic consequence of the product's failure, such as lost profits, lost opportunities and the like. See D. Dobbs, *Remedies,* §§ 3.2 at 139, 3.3 at 153–54 (1973).

SRP has a claim in tort under the analysis set forth earlier (*ante* at 208). Restatement (Second) of Torts § 402A; *see Russell v. Ford Motor Co., supra; O.S. Stapley v. Miller, supra.*

Considering these factors in assessing SRP's claim for consequential or economic loss and noting that the main loss is the type usually compensated under tort law, we believe that allowing SRP to recover this additional, consequential loss in tort, subject to the remedial limits imposed by the rules of certainty and non-remoteness (*see* D. Dobbs, *supra*, § 3.3), would not frustrate the UCC remedial scheme and would be consistent with the purposes of strict liability in tort.

Having applied the three-part analysis to the facts in their present posture, we hold that all factors militate in favor of the conclusion that recovery, if any, provided by the UCC, is not SRP's exclusive remedy for the losses it alleges. Under the facts assumed as true for the purpose of reviewing summary judgment, tort theory is available to SRP.

## STRICT LIABILITY AND THE EXTRAORDINARY CONSUMER

Westinghouse argues, however, that, even if the claim sounds in tort, SRP may not assert the theory of strict liability. That doctrine, it urges, is limited to "ordinary consumers" and is not available to "commercial giants" such as SRP—a buyer large enough to accept its own risk of loss in return for a lower price and capable of passing the eventual loss on to its own customers. Thus, Westinghouse concludes, the doctrine of strict tort liability is not needed to protect SRP and should not be available to it. The court of appeals agreed. We agree with the premise but not with the conclusion.

It is true that SRP can "take care of itself." It is large enough, in the ordinary situation, to bargain to accept the risk or not and, having accepted it, to distribute it among its large number of customers. If SRP is a "victim," it is certainly not a

helpless victim. We may assume, therefore, that the need for risk distribution and compensation does not compel the application of the doctrine of strict tort liability. Many courts have refused, on this basis, to apply that doctrine to buyers such as SRP, reserving it exclusively for "ordinary consumers." *See Scandinavian Airlines System v. United Aircraft Corp.*, 601 F.2d 425, 428 (9th Cir.1979); *Avenell v. Westinghouse Electric Corp.*, 41 Ohio App.2d 150, 158–59, 324 N.E.2d 583, 588–89 (1974). One of these courts, the California Court of Appeals, views strict product liability law as a form of "judicial paternalism" designed merely to fill the gaps left by the UCC. *Kaiser Steel Corp. v. Westinghouse Electric Corp.*, 55 Cal.App.3d 737, 748, 127 Cal.Rptr. 838, 845 (1976). We disagree with this view.

As pointed out earlier (*ante* at 205), the doctrine of strict tort liability has additional objectives. Foremost among these is the promotion of safety. The doctrine of strict tort liability provides manufacturers a strong incentive to design, manufacture and distribute safe products. W. Prosser & W. Keeton, *supra*, § 4 at 25–26. That goal of tort law is best served when those who distribute products are held strictly liable for damage resulting from products which contain unreasonably dangerous defects, which cause "accidents" endangering life or property, and which actually damage persons or property.

> Any suggestion that commercial purchasers of hazardously defective products must resort exclusively to UCC remedies and are barred from recovery in the realm of tort law is at odds with the policies underlying tort and contract principles .... contract law is largely inapposite to the problem of hazardous defects, because purchasers are not expected to bargain for a safe product—they have a right to such a purchase correlative to the manufacturer's duty to provide safe equipment.

*Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.*, 652 F.2d at 1175.

■ Other factors militate in favor of a uniform rule which applies to all consumers. Immunity, including the limited immunity from claims by certain classes of claimants, does not promote adherence to the standards of care imposed by the law. *Ryan v. State*, 134 Ariz. 308, 656 P.2d 597 (1982). We do not limit the availability of § 402A recovery to "ordinary consumers" but recognize its viability for all who can meet its proof requirements. This court does not favor distinctions based upon the class or size of the parties before it. The applicability of a tort theory depends not upon the size of the plaintiff, but upon the nature of the claim. The very attempt to distinguish tort rights on the basis of economic strength would raise collateral issues which we deem irrelevant. An actor has no more privilege to inflict injury on the wealthy than on the poor. The same rules apply to all, plaintiff or defendant, large or small. We hold, therefore, that the doctrine of strict tort liability is not limited to "ordinary consumers." It is available, on the same basis, to SRP and any other claimant.

Westinghouse argues, however, that even if SRP may assert the theory of strict liability in the ordinary case, it is foreclosed here because it has waived any tort claim or claim of damage in excess of the $15,000 purchase price of the product—the LMC. We agree with Westinghouse that the words of the "Limitation of Liability" on the reverse side of the Westinghouse acceptance form clearly and unambiguously mandate that result. SRP claims, however, that the form "Limitation of Liability" cannot be given effect.

## CAN LIABILITY IN TORT BE BARGAINED AWAY?

■ We begin by noting that there is a difference between attempts by a seller to disclaim warranty liability and attempts to disclaim liability in tort. Comment *m* to the Restatement (Second) of Torts § 402A states explicitly that a plaintiff's rights under § 402A are not governed by the Uniform Commercial Code and are "not affect-ed by any disclaimer or other agreement." Courts have acknowledged this distinction between tort and UCC in upholding a disclaimer of express and implied warranties while refusing in the same case to find an adequate disclaimer of tort liability. *See Sterner Aero AB v. Page Airmotive, Inc.*, 499 F.2d 709, 712–13 (10th Cir.1974); *Southern California Edison Co. v. Harnischfeger Corp.*, 120 Cal.App.3d 842, 856, 175 Cal.Rptr. 67, 76 (1981). Some courts have held that disclaimers of tort liability are *per se* unenforceable. *See Vandermark v. Ford Motor Co.*, 61 Cal.2d 256, 37 Cal.Rptr. 896, 391 P.2d 168 (1964); *Haley v. Merit Chevrolet, Inc.*, 67 Ill.App.2d 19, 214 N.E.2d 347 (1966). We do not go this far, but do acknowledge that the UCC rules for effectively disclaiming warranty obligations have no bearing on a seller's tort liability. *See* UCC §§ 2–316 & 2–719 (A.R.S. §§ 47–2316 & 47–2719); J. White & R. Summers, *supra*, § 12–2 at 351. Thus, a finding that a warranty has been properly disclaimed in the terms of a contract would not mandate a finding that a similar limitation of tort liability in the same contract is effective. Regardless of the obligations a seller assumes or disclaims by contract, it ordinarily remains subject to tort liability, which does not arise out of contract but is imposed by law. *Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co., supra; see Vandermark v. Ford Motor Co., supra;*

■ The problem presented here is not unique; the general reaction of courts to attempted disclaimers of strict tort liability is reflected in their unfavorable attitude toward attempts to disclaim or limit responsibility for negligence:

> [T]he law does not look with favor upon one exacting a covenant to relieve himself of the basic duty which the law imposes on everyone: that of using due care for the safety of himself and others. This would tend to encourage carelessness.

*Union Pacific Railroad Co. v. El Paso Natural Gas Co.*, 17 Utah 2d 255, 259, 408 P.2d 910, 913 (1965). Nevertheless,

[i]n cases where the public interest or some statutory prohibition are [sic] not involved, it is permissible for a party to a contract to absolve himself from liability for future negligence ... [but] such provisions are strictly construed against the person relying upon them.

*Basin Oil Co. of California v. Baash-Ross Tool Co.*, 125 Cal.App.2d 578, 594, 271 P.2d 122, 131 (1954). Under certain circumstances, then, the parties may allocate the risks of loss, but they "must clearly intend to do so." *M/V American Queen v. San Diego Marine Construction Corp.*, 708 F.2d 1483, 1488 (9th Cir.1983).

In a commercial setting there are often sound reasons for an enterprise to forego warranty protections and to bargain away recourse to other means of recovery, including tort, should losses occur. For instance, a lower price for a product may be the *quid pro quo* for the buyer's assumption of risks of latent defects in the product. *Industrial Uniform Rental Co., Inc. v. International Harvester Co.*, 317 Pa.Super. 65, 75, 463 A.2d 1085, 1091 (1983) (quoting *Jones & Laughlin Steel Corp. v. Johns-Manville Sales Corp.*, 626 F.2d 280, 288–89 (3d Cir.1980)).

This exception to the ancient principle that a party may not immunize himself from the consequences of his own negligence is predicated upon the consideration that businessmen can bargain over which party is to bear the risk of damage and set the price accordingly, thus achieving a more rational distribution of the risk than the law would otherwise allow. [Citations omitted.] The rationale presupposes that the contracting parties have in fact considered the negative costs of insuring against negligent design and manufacture and have incorporated their conclusions into the contract....

*Jig the Third Corp. v. Puritan Marine Insurance Underwriters Corp.*, 519 F.2d 171, 176 (5th Cir.1975), *cert. denied*, 424 U.S. 954, 96 S.Ct. 1429, 47 L.Ed.2d 360 (1976) (emphasis supplied).

From these cases and the discussion earlier in this opinion certain principles can be distilled. Imposing strict liability in tort on manufacturers when a defective product causes damage to persons and property promotes safety. The law disfavors contractual provisions by which one party seeks to immunize himself against the consequences of his own torts. Although there are exceptions to the principle disfavoring attempts to gain immunity, they are narrowly drawn and posit that certain conditions are met—that there is no public policy impediment to the limitation, *see Basin Oil Co. of California v. Baash-Ross Tool Co., supra*, and that the parties did, *in fact*, bargain for the limitation. *See Jig the Third Corp. v. Puritan Marine Insurance Underwriters Corp., supra; Atlas Mutual Insurance Co. v. Moore Dry Kiln Co.*, 38 Or.App. 111, 589 P.2d 1134 (1979). Finally, a rule of construction governing the interpretation of such limitations requires that the limiting language be construed most strictly against the party relying on it. *Keystone Aeronautics Corp. v. R.J. Enstrom Corp.*, 499 F.2d 146, 150 (3rd Cir.1974); *Neville Chemical Co. v. Union Carbide Corp.*, 422 F.2d 1205, 1216 (3rd Cir.), *cert. denied*, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970).

The cases also indicate that courts are most willing to give effect to contractual limitations on liability where the parties are on an "equal footing." *See, e.g., Gill v. Rollins Protective Services Co.*, 722 F.2d 55 (4th Cir.1983). On the assumption that sound business reasons are present for placing the limitation of liability in the contract, courts take the most relaxed view when the parties are business entities. *See Jones & Laughlin Steel Corp. v. Johns-Manville Sales Corp., supra; Jig the Third Corp. v. Puritan Marine Insurance Underwriters Corp., supra.* The California court of appeals concluded

that the doctrine of products liability does not apply as between parties who: (1) deal in a commercial setting; (2) from positions of relatively equal bargaining

strength; (3) bargain the specifications of the product; and (4) negotiate concerning the risk of loss from defects in it. *Kaiser Steel Corp. v. Westinghouse Electric Corp.*, 55 Cal.App.3d at 748, 127 Cal. Rptr. at 845.[3] *Accord A.C. Hoyle Co. v. Sperry Rand Corp.*, 128 Mich.App. 557, 561–62, 340 N.W.2d 326, 328 (1983). We believe these factors are relevant to a determination of the effectiveness of a tort disclaimer because they focus the examination on the bargaining process. Of particular importance is the fourth factor, which deals directly with the part of the bargaining process that is incorporated as the contractual limitation on liability. While parties to a contract may "disclaim responsibility for any potential liability under § 402A, they must expressly spell out their intention to do so." *Pennsylvania Glass Sand v. Caterpillar Tractor Co.*, 652 F.2d at 1175; *accord Posttape Associates v. Eastman Kodak Co.*, 537 F.2d at 755.

We reproduced the "terms and conditions" of the Westinghouse sales form in some detail (*ante* at 202) and agreed with the court of appeals that this formed the contract between SRP and Westinghouse for disposition of this case under the UCC (*ante* at 204–205). We also quoted the affidavit of SRP's assistant general manager at length (*ante* at 202–203) because it bears directly on the bargaining process. There is no doubt that SRP and Westinghouse are both commercial "giants" and bargained for the LMC in a commercial setting. However, comparability of size among corporations does not mean, as a matter of law, that in a particular transaction a corporation has bargaining strength relatively equal to all other corporations of similar size. Much depends on the nature of the transaction, the nature of the product, the relative knowledge of the parties concerning the product, and the availability of other products to fit the needs of the purchaser. *Cf. Sterner Aero AB v. Page Airmotive, Inc., supra; Southern California Edison Co. v. Harnischfeger Corp., supra.* These are factual questions that need to be answered before the second *Kaiser* factor will be satisfied. Taken in the light most favorable to SRP (the party against whom summary judgment was rendered), there is a genuine issue of material fact. The finder of fact may conclude here that SRP was forced to accept the LMC on Westinghouse's terms because no other device was available to enable it to save its $9,000,000 investment in turbines manufactured by Westinghouse. Whether the parties were in an equal bargaining position is a question of fact.

Moreover, there are factual questions concerning the bargaining for the specifications of the product, the third *Kaiser* factor. Even though SRP may be considered an expert in the field of electric utilities generally, its specific expertise in the manufacture of the LMC was not established. Thus, it is questionable whether SRP bargained for the product specifications at all. *Cf. Sterner Aero AB v. Page Airmotive, Inc.*, 499 F.2d at 713.

Most importantly, there is a genuine factual question concerning whether the limitation of liability was actually bargained for. The affidavit of SRP's assistant general manager indicates that there was merely an exchange of standardized forms and that the language of the "terms and conditions" was never discussed, much less negotiated. There is no evidence that any responsible SRP official was aware of the disclaimer on the Westinghouse form. There is no evidence of how the parties determined the allocation of risks. As we acknowledged earlier in this opinion, the law frowns upon tort disclaimers because they tend to undermine the prophylactic principles of tort law. The party asserting

**3.** *Kaiser* and the California cases which have followed it use this four-part analysis to make the threshold determination of whether strict tort theory will apply in a particular case. Because we have concluded, under the assumed facts and the analysis set forth *ante* at 209–210, that the plaintiff here may proceed in tort, we do not rely on *Kaiser* to define the limits of strict tort liability in this setting. Rather, we think the *Kaiser* factors properly bear only on the issue of whether any potential tort liability has been effectively disclaimed.

the effectiveness of a disclaimer must show, therefore, that the appearance of the disclaimer language in any agreement, especially a standardized form, was not merely inadvertent. This requires a factual showing that the provision was a part of the bargaining and negotiating process—a showing that was not made here.

We hold, therefore, that disclaimers of liability in cases governed by the Uniform Commercial Code are to be construed and applied in accordance with that Code. *See* A.R.S. § 47–2719 (5 Ariz. Leg.Serv. 262–63 (1984)). The party who loses the "battle of forms" may waive his commercial remedies even though he is uninformed as to what he is waiving, is unaware of the waiver, and would not have entered into the transaction had he known about it. In such a situation, if all that exists is a commercial claim and not a tort claim, there will be no remedy. But where there is a tort claim, with or without a commercial claim, the battle of forms will not suffice to decide the disclaimer issue. The UCC disclaimer, a method of promoting the free flow of goods, is not effective to waive tort remedies.

We hold, however, that tort remedies may be waived. Although tort law does not recognize "disclaimers" and will not give them effect, it will recognize waivers. A waiver will be given effect when it represents "an intentional relinquishment of a known right." *City of Tucson v. Koerber*, 82 Ariz. 347, 313 P.2d 411 (1957); D. Dobbs, *supra*, § 2.3 at 43. That relinquishment will be permitted where commercial parties have equal bargaining positions so that the choice was freely and fairly made and not forced by the circumstances. Further, the parties must have negotiated the specifications of the product and have knowingly bargained for the waiver. Under these circumstances our courts will enforce the bargain, even if it turns out to have been a bad bargain for one party or the other. The agreement will not be enforced, however, when it is the product of coercion or inadvertence. Tort remedies may not be waived in an unknow-

ing exchange of forms between shipping clerk and order clerk. An actual bargain must be made by those responsible for the transaction.

The evidence here presents several issues of fact as to the existence of such a bargain, and it was therefore error to grant summary judgment. Upon remand, the trial court should first determine if UCC remedies are SRP's exclusive remedy. This decision will turn on the factors (nature of the defect, manner of loss, and type of damage) described *ante* at 206–210. If SRP is not limited to UCC remedies, it may proceed with its tort claim, subject to the trial court's ruling on the waiver issue. On this issue, the parties should be allowed to present evidence on the following: 1) the parties' actual bargaining strength, 2) the existence of any bargaining regarding product specifications, and 3) the existence of any actual bargaining or negotiation concerning allocation of risks and limitation of liability. On the basis of the evidence presented, the court can decide whether SRP waived its tort remedies. If the court finds that there was not an effective waiver, the tort action may proceed in the usual manner.

The judgment is reversed. The opinion of the court of appeals is approved in part and vacated in part. The case is remanded for further proceedings not inconsistent with this opinion.

HOLOHAN, C.J., GORDON, V.C.J., and HAYS and CAMERON, JJ., concur.