*414 McGREGOR, Vice Chief Justice,
dissenting.
¶ 44 I respectfully dissent. The issue in this case is 'whether, when the Framers drafted the Arizona Constitution, they intended that the term “assumption of risk,” as used in Article 18, Section 5, would encompass express contractual waivers of liability. Unlike the majority, I do not regard the language of Article 18, Section 5 as clear and unambiguous. Moreover, after considering both the language of and the history surrounding the adoption of this constitutional provision, I would hold that the better-reasoned conclusion is that “assumption of risk,” as used in the constitution, refers only to implied assumption of risk and not to express contractual waivers of liability. Hence, unlike the majority, I would conclude that a court can consider whether, as a matter of law, an express contractual waiver can be enforced.
I.
¶45 My disagreement with the majority opinion begins with its conclusion that the phrase “assumption of risk” is clear and unambiguous. Op. ¶¶ 11, 35, 39. To be sure, the majority correctly characterizes the phrases “in all cases whatsoever” and “at all times” as clear and broad language. But “assumption of risk” is a legal term of art that describes a legal theory that has evolved over the years.
¶46 Assumption of the risk entered the legal lexicon as a term of art describing one of the “unholy trinity” of defenses — along with contributory negligence and the fellow servant rule — developed in the late nineteenth century to protect employers against employee tort claims for injuries incurred on the job. See Hough v. Tex. & Pac. Ry. Co., 100 U.S. 213, 25 L.Ed. 612 (1879). During its nascency, the doctrine of assumption of risk was based on analogies to contract theory and limited solely to the master-servant context. G. Edward White, Tort Law in America: An Intellectual History 42 (2003) (The doctrine of assumption of risk “originated in the ‘status’ context of servants’ relations with their masters.”).
¶47 By the time of the drafting of the Arizona Constitution, the defense of assumption of the risk had developed into an amorphous concept defined in a variety of ways by commentators and courts. Some legal scholars argued that the contract analogies that once undergirded the doctrine of assumption of the risk could not adequately support the increasingly broad applications of the defense. See, e.g., Francis Wharton, A Treatise on the Law of Negligence, § 200, at 178-80 & n. 1 (Philadelphia, Kay & Brother, 2d ed. 1878) (pointing out that not all servants were competent to contract and that many jurisdictions had found contractual waivers of liability to be invalid as against public policy). These commentators argued that assumption of the risk is more properly grounded in tort principles, rather than in the legal fiction of implied contracts. Dining this same period, other-commentators explored the possibility of expanding the doctrine beyond the employer-employee relationship. See, e.g., Charles Warren, Volenti Non Fit Injuria in Actions of Negligence, 8 Harv. L.Rev. 457, 459 (1895) (asserting the rule that “[o]ne who knows of a danger arising from the act or omission of another, and understands the risk therefrom, and voluntarily exposes himself to it, is precluded from recovering for an injury which results from the exposure”). These scholars argued that assumption of the risk was a potential defense to any tort claim, whether or not a master-servant relationship existed between the parties.
¶48 Courts in various jurisdictions also struggled during this period to determine the contours of the doctrine of assumption of the risk. See, e.g., Welsh v. Barber Asphalt Paving Co., 167 F. 465, 470-71 (9th Cir.1909) (recognizing a split in authority regarding whether assumption of the risk sounds in contract or in the tort concept of volenti non fit injuria); Valjago v. Carnegie Steel Co., 226 Pa. 514, 75 A. 728, 729 (1910) (same). The Supreme Court recognized the confusion surrounding the doctrine of assumption of the risk during that period in Schlemmer v. Buffalo, Rochester & Pittsburg Ry. Co., 205 U.S. 1, 27 S.Ct. 407, 51 L.Ed. 681 (1907). There, Justice Holmes, writing for the Court, questioned the “rather shadowy” connection between “the notion of contract” and a broad *415 concept of assumption of risk and noted that assumption of risk “shades into negligence as commonly understood.” Id. at 12, 27 S.Ct. 407. In fact, the similarities between assumption of risk and contributory negligence were so great that some courts “treated assumption of risk and negligence as convertible terms.” Id. at 13, 27 S.Ct. 407 (citing Patterson v. Pittsburg & Connellsville R.R. Co., 76 Pa. 389 (1874)).
¶ 49 Justice Frankfurter captured well the confusion surrounding the phrase:
The phrase “assumption of risk” is an excellent illustration of the extent to which uncritical use of words bedevils the law. A phrase begins life as a literary expression; its felicity leads to its lazy repetition; and repetition soon establishes it as a legal formula, undiseriminatingly used to express different and sometimes contradictory ideas.
Tiller v. Atl. Coast Line R.R. Co., 318 U.S. 54, 68, 63 S.Ct. 444, 87 L.Ed. 610 (1943) (Frankfurter, J., concurring).
¶ 50 I simply cannot regard a phrase that carries “different and sometimes contradictory” meanings as unambiguous. The question is not whether Article 18, Section 5 can be interpreted as applying to both implied assumption of the risk and express contractual waiver of liability; one can, of course, adopt that interpretation. The question is whether the Framers intended that Article 18, Section 5 extend to express contractual waivers. I find quite compelling the evidence that the drafters of the constitution intended to limit the phrase to implied assumptions of risk.
II.
¶ 51 When a phrase is ambiguous, fundamental principles of constitutional construction require us to look to extrinsic evidence to determine its intended effect. Jett v. City of Tucson, 180 Ariz. 115, 119, 882 P.2d 426, 430 (1994). Specifically, we consider the “history behind the provision, the purpose sought to be accomplished [by its enactment], and the evil sought to be remedied.” Id.
¶ 52 The proposals and comments of the Framers during Arizona’s constitutional convention provide the most persuasive evidence of their intent in adopting Article 18, Section 5. The majority of these progressive, labor-friendly individuals found the doctrine of assumption of the risk highly objectionable. See generally, Roger C. Henderson, Tort Reform, Separation of Powers, and the Arizona Constitutional Convention of 1910, 35 Ariz. L.Rev. 535 (1993) (detailing the party platforms and political makeup of Arizona’s constitutional convention); Noel Fidel, Preeminently a Political Institution: The Right of Arizona Juries to Nullify the Law of Contributory Negligence, 23 Ariz. St. L.J. 1, 9-12 (1991). By the time Arizona convened its constitutional convention, courts across the nation had liberally applied the doctrine of assumption of the risk in ways that thwarted efforts by injured employees to recover on tort claims against employers. In an effort to protect Arizona laborers, the Framers included a number of tort-related sections in the Arizona Constitution. In fact, “of the 153 propositions introduced at the constitutional convention, there were nine that in some measure would affect the law of torts.” Henderson supra, at 576. The progression of two of these propositions from introduction to engrossment is particularly helpful in determining the Framers’ understanding of “assumption of risk.”
¶ 53 Proposition 88 ultimately became Article 18, Section 5. As introduced, Proposition 88 read in pertinent part:[12]
Section 2. No law shall be enacted and no rule of law shall be recognized in the State of Arizona whereby the defense of “fellow servant” or the defense of “assumption of risk” shall be recognized in actions to recover damages in cases of injury or death covered in the first section of this article;
Section 3. No waiver by contract of right to recover damages under this Article shall be valid.
*416 The Records of the Arizona Constitutional Convention of 1910 at 1228 (John S. Goff ed.) (hereinafter Goff).
¶54 The first lesson to be learned from this original version devolves from the fact that it clearly distinguishes between the common law doctrine of assumption of risk (eliminated by section 2) and express contractual waivers (prohibited by section 3). If the Framers had considered express contractual waivers to be included in the common law doctrine of “assumption of risk,” they would have had no need to propose section 3; section 2 would have prevented enforcement of such contracts. The fact that section 3 was included in proposition 88 indicates that the Framers viewed express contractual waivers as distinct from common law assumption of risk.
¶ 55 Proposition 88 did not ultimately pass in its original form. An amendment struck section 2, and replaced it with the language of Article 23, Section 6 of the Oklahoma Constitution, providing that “[t]he defense of contributory negligence or of assumption of the risk shall in all cases whatsoever be a question of fact, and shall at all times be left to the jury.” Goff, supra, at 883-84. This version of section 2 ultimately became engrossed in the constitution as Article 18, Section 5. The Framers dropped section 3 because it appeared redundant of the language found in two other Propositions, 47 and 50. Id. at 542, 548.
¶ 56 The original version of Proposition 50, which directly addressed the right of employers to require employees to waive a right to recover damages for employment-related injuries, read in pertinent part:
[N]o law shall be enacted in this State limiting the amount of damages to be recovered for causing the death or injury of any person. Any contract or agreement with any employee waiving any right to recover damages for causing the death or injury of any employee shall be void.
Goff, supra, at 1147. When the Committee of the Whole took up discussion of Proposition 50, some delegates suggested that the specific protection from express contractual waivers of liability should be afforded to everyone, rather than limited to employees.
Id. at 152. In fact, Delegate Baker specifically argued that this provision should be broadened to prevent railroad companies from extracting express liability waivers from passengers. Id. The Committee of the Whole agreed and ultimately adopted an amended version of Proposition 50, striking the reference to employees.
¶ 57 Had Proposition 50 in this amended form been engrossed in the Arizona Constitution, we would not currently be deciding whether questions involving express contractual waivers must go to a jury; the waivers would be null and void under the constitution. Curiously, however, this amended version of Proposition 50 did not become part of the text of the Arizona Constitution. Instead, during the final reading of the newly engrossed provisions, a delegate moved to include only the first sentence of Proposition 50 as Article 2, Section 31, and the provision relating to contractual releases was entirely deleted from the constitution. Id. at 897.
¶ 58 The records of the convention do not explain why the second sentence of Proposition 50 was not included in the final version of the constitution. One reason for the ultimate decision to eliminate the language nullifying contractual releases in all eases may well have been the concern by many delegates that such a provision, by proscribing the right to contract, would violate the federal constitution. See id. at 548. The delegates had good cause for concern.
¶ 59 Just five years prior to Arizona’s constitutional convention, the United States Supreme Court issued its infamous opinion in Lochner v. New York, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905). In Lochner, the Court defined the right to contract as a liberty interest protected by the Fourteenth Amendment. Id. at 53. State statutes that prohibited individuals from entering into certain kinds of contracts could be upheld only if a direct connection existed between the statute and the health, morals, and general welfare of the public. Id. Thus, the Lochner Court struck down a New York statute that limited the number of hours an employee in a bakery could work. Id. at 64, 25 S.Ct. 539.
*417 ¶ 60 Delegates to the Arizona constitutional convention were clearly concerned that any attempt to extend too broadly the prohibition against express contractual liability waivers would violate Lochner. Delegate Baker first sounded this alarm, confessing that “[he was] in doubt as to whether you can limit all contracts or not.” Goff, supra, at 152. Delegate Jones revisited this concern later in the convention, questioning whether Proposition 50 as amended “would be nullified anyway.” Id. at 548. Delegate Cunningham responded adamantly that this would indeed be the case and that inclusion of such a broad limitation on the right to contract would be “absolutely absurd and wrong.” Id.
¶ 61 Whatever the reason behind the ultimate failure of the convention to include the second sentence of Proposition 50 in the constitution, the debate surrounding this clause provides strong evidence that the delegates were keenly aware of the distinction between express contractual waivers and the common law defenses of assumption of risk and contributory negligence. Moreover, the concerns raised by the delegation over the likelihood that a provision broadly inhibiting the right to contract would violate the federal constitution explains why the Framers chose to deal with express contractual defenses more cautiously than they dealt with implied assumption of risk.[13]
¶ 62 The treatment given employment contracts in the Arizona Constitution emphasizes the distinction made between implied and express assumption of risk. The Framers specifically addressed express liability waivers in certain employment contracts in Article 18, Section 3. That provision makes it
unlawful for any person, company, association, or corporation to require of its servants or employees as a condition of their employment, or otherwise, any contract or agreement whereby such person, company, association, or corporation shall be released or discharged from liability of responsibility on account of personal injuries which may be received by such servants or employees which in the service or employment of such person, company, association, or corporation, by reason of the negligence of such person, company, association, corporation, or the agents or employees thereof; and any such contract or agreement if made, shall be null and void.
Ariz. Const. art. 18, § 3.
¶63 The Framers were clearly aware of the existence of express contractual liability waivers in the employment context and viewed these waivers as distinct contractual problems requiring a separate constitutional remedy. This provision, too, supports the conclusion that the Framers distinguished between implied assumption of risk and express contractual waivers of liability.
¶ 64 Although an argument can be made to the contrary, I would hold that the more reasonable conclusion to draw from the history of Article 18, Section 5 is that the Framers viewed assumption of risk and express contractual liability waivers as distinct concepts. Article 18, Section 5, therefore, confers broad powers upon the jury in those eases in which the common law defense of implied assumption of risk arises but does not extend to express waivers of liability.
III.
V 65 Our judicial treatment of express contractual waivers of liability also argues in favor of excluding such waivers from Article 18, Section 5. In the nearly 100 years since adopting our constitution, we have never applied Article 18, Section 5 in the context of an express contractual liability waiver. In fact, *418 for the past several decades, Arizona courts consistently have decided the enforceability of express release agreements as a matter of law, using well-established contract principles.
¶ 66 In 1984, this court held that parties may contractually allocate the risks of tort liability and that courts will enforce such agreements if strict conditions are met. Salt River Project Agric. Improvement & Power Dist. v. Westinghouse Elec. Corp., 143 Ariz. 368, 383, 694 P.2d 198, 213 (1984) (SRP). In SRP, we noted initially that the “law disfavors contractual provisions by which one party seeks to immunize himself against the consequences of his own torts.” Id. Hence, courts will enforce express contractual waivers of tort liability only if: (1) the waiver does not violate public policy; (2) the parties did in fact bargain for the waiver; and (3) the parties were on relatively “equal footing.” Because of those restrictions, courts are more likely to uphold such waivers in the context of a contract between two business entities of relatively equal bargaining power.[14] Id.
¶ 67 Since our decision in SRP, the court of appeals has extended our analysis to uphold summary judgment against plaintiffs in personal injury claims based upon express waivers.[15] See, e.g., Lindsay v. Cave Creek Outfitters, L.L.C., 207 Ariz. 487, 88 P.3d 557 (App.2003); Benjamin v. Gear Roller Hockey Equip., Inc., 198 Ariz. 462, 11 P.3d 421 (App.2000); Valley Nat’l Bank v. Nat’l Ass’n for Stock Car Auto Racing, Inc., 153 Ariz. 374, 736 P.2d 1186 (App.1987). Other cases have denied summary judgment for defendants only because fact questions remained regarding the express waivers. See, e.g., Morganteen v. Cowboy Adventures, Inc., 190 Ariz. 463, 466-67, 949 P.2d 552, 555-56 (App.1997) (reversing summary judgment for defendant where question of fact existed as to whether parties actually bargained for the liability waiver); Maurer v. Cerkvenik-Anderson Travel, Inc., 181 Ariz. 294, 298, 890 P.2d 69, 73 (App.1994) (affirming trial court’s denial of summary judgment for defendant where the express waiver did not “alert Plaintiff’s decedent to the specific risks that she was supposedly waiving”); Sirek v. Fairfield Snowbowl, Inc., 166 Ariz. 183, 188, 800 P.2d 1291, 1296 (App.1990) (reversing summary judgment for defendant because the liability waiver did not expressly include negligence within its scope). The majority opinion presents no compelling reason to depart from this established jurisprudence.
¶ 68 For the foregoing reasons, I would affirm the opinion of the court of appeals and the trial court judgment granting summary judgment to Firebird.
CONCURRING: CHARLES E. JONES, Chief Justice.

. Proposition 88 also included a provision requiring the establishment of an employer’s liability law and a provision prohibiting the legislature from limiting damages for tort claims. The Records of the Arizona Constitutional Convention of 1910 at 1227-28 (John S. Goff ed.). These provisions ultimately became Sections 6 and 7 of Article 18. Id. at 1373.

. If the Framers looked to Arizona case law to guide their conclusion as to the meaning of “assumption of risk,” they would have found little assistance. To the extent case law provided any guidance, it would have confirmed the conclusion that constitutional history suggests: Express contractual waivers did not fall within the meaning the Framers attached to "assumption of risk." No published Arizona decision pre-dating our constitution applied the assumption of the risk doctrine to an express contractual waiver of liability. Indeed, those few reported cases on point dealt only with assumption of the risk as an implied element of the employment contract. See S. Pac. Co. v. McGill, 5 Ariz. 36, 44 P. 302 (1896) (recognizing that an employee upon entering into his contract of service is presumed to assume all the risk naturally incident to his employment); Ariz. Lumber & Timber Co. v. Mooney, 4 Ariz. 96, 33 P. 590 (1893) (same).

. The holding in SRP recognizes the unique need in commercial settings for broad and flexible contract rules that permit parties to bargain for a more rational distribution of risks and benefits. 143 Ariz. at 383, 694 P.2d at 213. The majority opinion ignores that consideration. Although equally positioned parties may still enter into express liability waivers, such waivers must now be submitted to a juty for a determination of enforceability. This change in law can substantially affect contracting parties. Parties to a contract negotiate contract conditions not only in the hope that, should a lawsuit ever arise, they will prevail at trial before a jury, but also to avoid the costs of extended litigation altogether.

. The legislature has codified similar extensions by enacting statutes that immunize certain businesses with substantial inherent risks from tort liability if these businesses obtain a signed, valid release from customers. See, e.g., A.R.S. § 12-553 (2003) (immunizing equine owners). In fact, the release signed by Phelps in this case most likely resulted from Firebird's attempt to comply with A.R.S. § 12-556, which provides limited liability for owners of closed-course motor sport facilities.