840 P.2d 1024

ANGUS MEDICAL COMPANY, an Ari-
zona Corporation, d/b/a Summit
Software, Plaintiff–Appellant

v.

DIGITAL EQUIPMENT CORPORA-
TION, a Massachusetts corpora-
tion, Defendant–Appellee.

No. 1 CA–CV 90–059.

Court of Appeals of Arizona,
Division 1, Department B.

March 31, 1992.

Reconsideration Denied June 15, 1992.

Review and Cross–Petition for
Review Denied Dec. 1, 1992.

Rake, Copple, Downey & Black, P.C. by Lynn M. Roseberry, Phoenix, for plaintiff-appellant.

Fennemore Craig by Roger T. Hargrove, Phoenix, for defendant-appellee.

## OPINION

LANKFORD, Judge.

The plaintiff, Angus Medical Company ("Angus"), filed its complaint on January 27, 1987, against defendant Digital Equipment Corporation ("Digital") alleging claims for breach of contract, breach of warranties, negligence, fraud, and an accounting. The complaint arose from a series of agreements signed in early 1983 between Angus and Digital in which Digital undertook to convert Angus's software programs to operate on Digital personal computers.

Digital filed a motion to dismiss the entire complaint. The superior court subsequently dismissed Angus's claim for consumer fraud. Digital filed a motion for summary judgment against the remaining claims. The superior court granted the motion based on the statute of limitations, entered judgment, and awarded attorneys' fees to Digital. After the court entered an order denying Angus's motion for reconsideration and for a new trial, Angus appealed to this court from the order and from the judgment.

Two issues are involved in this appeal:

(1) When did Angus's cause of action against Digital accrue?

(2) Is the contract term shortening the otherwise applicable statutes of limitation to eighteen months a bar to Angus's complaint?

### I.

On March 29, 1983, Dr. Richard P. Jacoby, president of Angus, signed a "Work Statement for Advisory Consulting" (Work Statement) submitted by Digital. This doc-

ument contained an estimate of time necessary to "convert existing 'Alphamicro' software to run on a Digital PC–350." The document included the following language on the signature page: "I have reviewed the attached work statement prepared for Summit Software and agree to its contents. I also have read and agree to Digital's Software Services Terms and Conditions."

On May 5, 1983, Mr. Rick Kelly, software manager for Angus, signed another document, a quotation of costs ("Quotation") estimated at $24,000. On this document appeared the following words: "Purchaser should not execute this contract offer unless the applicable set of terms and conditions are attached to the Quotation or unless a discount agreement is filled in above." No discount agreement had been filled in. The quotation document also stated:

> Purchaser hereby agrees that it has read the applicable terms and conditions, understands them, and agrees to be bound by same.
>
> * 1. Software Professional Services Terms and Conditions

Several weeks later, Digital wrote a letter to Mr. Kelly that for the first time presented to Angus the Terms and Conditions form. The form, unlike either the Work Statement or the Quotation, did not contain a signature line or a space in which the parties could initial or otherwise indicate their assent to the particular provisions. The Digital letter stated in part:

> [T]he following change has been made to facilitate processing:
>
> Only Digital Professional Software Services Terms and Conditions apply (copy attached).
>
> We will continue to process your order with the above agreed change unless the undersigned is immediately advised to the contrary, but in any event within 10 days of the date of this notice.

Upon reading the attached Terms and Conditions form, Mr. Kelly became concerned about a term that purported to give Angus a license to software first made by Digital. Angus already held a copyright on the software being used in the conver-

sion project. In his affidavit, Mr. Kelly stated he called Mr. Sambrone, a Digital salesperson, and was told that the "Terms and Conditions [form] was a boilerplate mailing that [came] out automatically and did not apply" to Angus.

Paragraph 13 of the Terms and Conditions form contained language critical to the summary judgment entered by the superior court. It disclaimed all warranties, limited the property damage caused by Digital's fault or negligence to $100,000, and stated that "[a]ny action against Digital must be brought within eighteen (18) months after the cause of action accrues."

Digital began delivery of the new software in December, 1983. Angus, who in turn provided the software to medical offices for use in billing and other matters, almost immediately began receiving complaints from its customers that the software was not operating correctly. Angus stopped payment on a check to Digital in the amount of $30,000. Angus's customers continued to complain to Angus, and Angus relayed the complaints to Digital. In March, 1984, Angus wrote to Digital that it was sustaining lost sales in the range of $100,000 per month as a result of the software problems. Again in October, 1984, Angus wrote to Digital about continuing problems and its unhappiness with the software conversion.

On December 10, 1984, after apparently fruitless negotiations with Angus, Digital notified Angus by letter that Digital believed it had met its contractual obligations to Angus. In light of Angus's failure to provide payment in full for the rendered services, Digital declined "any further business involvement" with Angus.

Early in 1984, Angus had contacted two computer consulting firms in an attempt to repair or fix the conversion project. Both firms apparently concluded that the software needed to be rewritten to work properly. Dr. Jacoby, Angus's president, disregarded the advice because he felt that the consultants had a financial incentive for urging a complete rewrite. In January, 1985, Angus acquired a new general partner, Vortec. After the latter spent approx-

imately nine months working on the software, Vortec concluded that Digital had indeed failed to convert the software to correctly function on the Digital computers. Angus filed its complaint against Digital on January 27, 1987.

## II.

■ Summary judgment is appropriate if, from the pleadings, depositions, answers to interrogatories, requests for admissions, and affidavits, the superior court can find no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Ariz.R.Civ.P. 56(c). On appeal from the entry of summary judgment, this court must view the facts in the light most favorable to the party opposing the judgment and give that party the benefit of all favorable inferences that may reasonably be drawn from those facts. *Schroeder v. Hudgins*, 142 Ariz. 395, 396–7, 690 P.2d 114, 115–6 (App.1984). This court has also held that:

> Any evidence or reasonable inference contrary to the material facts—i.e. the facts which the moving party needs to show his entitlement to judgment—will preclude summary judgment. Mere speculation or insubstantial doubt as to the facts will not suffice, but where the evidence or inferences would permit a jury to resolve a material issue in favor of either party, summary judgment is improper.

*United Bank of Arizona v. Allyn*, 167 Ariz. 191, 195, 805 P.2d 1012, 1016 (App. 1990) (citations omitted). Our determination of whether the entry of summary judgment was proper is essentially *de novo*. *Id.*

## III.

■ We first consider whether a genuine issue of material fact exists as to the date the cause of action accrued. A tort action accrues when the plaintiff knows or in the exercise of reasonable diligence should know of the defendant's negligent conduct. *See Sato v. Van Denburgh*, 123 Ariz. 225, 227, 599 P.2d 181, 183 (1979). The applicable statute of limitations, absent

an enforceable agreement between the parties, is two years. Ariz.Rev.Stat.Ann. (hereafter cited as A.R.S.) § 12–542. A cause of action on a written contract accrues at the time of breach. *Beaudry Motor Co. v. New Pueblo Constructors*, 128 Ariz. 481, 626 P.2d 1113 (App.1981). Absent an enforceable agreement to the contrary, the applicable statute of limitations is six years. A.R.S. § 12–546.

■ Angus asserted both tort and contract claims in its complaint against Digital. However, it did not file suit until January, 1987. It argues that the delayed filing is not fatal because it neither knew nor had reason to know until late in 1985 (when Vortec diagnosed the software malfunctions as Digital's fault) that Digital was responsible. Thus in its view, the cause of action for its tort and contract claims did not accrue until late 1985, and the complaint was filed within both the two-year statute of limitations for tort and the six-year period for suit on a written contract.

Digital argued below that the eighteen-month limitation term in the Terms and Conditions form bars Angus's claims in both tort and contract. The superior court apparently agreed. It found that Angus's cause of action accrued after Digital severed its relations with Angus in December, 1984 because "Angus could not reasonably have believed that [Digital] would take further actions to remedy the software problem."

The evidence confirms the superior court's determination that Angus knew or should have known that it had a cause of action against Digital long before the end of 1985. Angus had stopped payment on its check to Digital in December, 1983, on the ground that Digital had not done what it had promised to do under the contract. Angus had repeatedly complained to Digital about the software problems and had tried to persuade Digital to correct them. Angus also threatened legal action against Digital in 1984. In addition, early in 1984 Angus had hired two computer consultants, both of whom concluded Digital's work

needed a complete re-write in order for the software to function properly.[1]

These actions and statements leave no room for doubt that at least by December 1984, Angus knew or should have known that Digital was responsible for the software conversion malfunctions. This is the only reasonable inference from the evidence. Therefore, the tort action accrued no later than December 1984, whether it was governed by the two year statutory period or the eighteen-month contract limitation, and the complaint was untimely when filed in January, 1987.

A claim arising out of a written contract, however, benefits from a longer statute of limitations than a tort claim. Whether Angus's tort claims are barred depends on whether the eighteen-month limitation term is enforceable. Digital either breached the contract on or about December, 1983, when the software failed to perform or at the latest in December, 1984, when it severed all dealings with Angus. The contract claims were barred when the complaint was filed in 1987 only if the eighteen-month limit is enforceable. Otherwise, the complaint was filed well within the six-year statutory period.

IV.

Angus argues that Digital waived application of the Terms and Conditions form (including the eighteen-month limitation term) when a Digital salesperson told an Angus employee that the form "was a boilerplate mailing that [came] out automatically and did not apply." Digital does not deny that its salesperson made this statement.

The superior court found that this statement had no effect. The court reasoned that the Terms and Conditions form became part of the contract when Angus signed the Work Statement in March, 1983, because the Work Statement required that the signer had "read and agree[d] to" Digital's Software Terms and Conditions. According to the court, the Work Statement proviso that "[n]o verbal agreement ... will be binding" on either party precluded the salesperson's oral statement from changing the parties' agreement because all changes in the Work Statement were to be in writing and incorporated into it.

The superior court rejected the salesperson's statement as an effective modification of the Work Statement and also as a waiver on the ground that either a modification or waiver must be in writing. However, we believe that whether the statement was a waiver of the Terms and Conditions or a modification of the Work Statement significantly affects the analysis.

■ We first consider whether a trier of fact could find that the Digital employee's statement was a modification of the contract. Assuming that the Work Statement clause was intended to bar changes to the contract, then a threshold question must be resolved: was the Terms and Conditions form, which the Digital employee's statement purportedly modified, part of the contract in the first place?

The superior court assumed that the Terms and Conditions became part of the contract with the signing of the Work Statement. But taking the facts in the light most favorable to Angus, this proposition is open to doubt. Digital's own correspondence denominated the Terms and Conditions form a "change," and the facts suggest that the form was provided to Angus several months after Angus had signed the Work Statement. This is sufficient evidence for a reasonable inference that the Terms and Conditions form was a "change" rather than part of the original agreement.

---

1. The only evidence to support a later accrual date for Angus's cause of action is Dr. Jacoby's statement that he disbelieved the consultants because of their financial interest in performing the work that they had recommended. However, he later accepted the same conclusion from another source. Moreover, this testimony merely shows that Dr. Jacoby ignored the consultants' advice, not that Angus lacked any reason to believe that Digital was the source of the problem. All of the other evidence, consisting of Angus's statements and conduct, shows beyond doubt that Angus had reason to be aware of Digital's contribution to the software problem.

■ Both the common law and the Work Statement require that all "changes" be "mutually agreed upon by both parties." One party to a written contract cannot unilaterally modify it without the assent of the other party. *Coronado Co., Inc. v. Jacome's Dept. Store*, 129 Ariz. 137, 140, 629 P.2d 553, 556 (App.1981); *Ruck Construction Co., Inc. v. City of Tucson*, 116 Ariz. 533, 570 P.2d 220 (App.1977). The Work Statement also provided that "[c]hanges that represent a departure from the currently defined scope of this Work Statement will be jointly negotiated." If the Terms and Conditions form was a change and was not negotiated and agreed upon, then the purported change (i.e., the Terms and Conditions form) never became part of the contract. It is unclear, however, whether the "changes" referred to in the Work Statement include the "change" represented by Digital's own Terms and Conditions form, especially where the Work Statement made reference to the existence and application of the Terms and Conditions. Thus, whether the Work Statement language referring to changes barred modifications is an issue which cannot be resolved by summary judgment.

We now consider whether a trier of fact could find that the salesperson's statement constituted a *waiver* of the Terms and Conditions form. A waiver need not be in writing. "Waiver is the voluntary and intentional relinquishment of a known right ..." *City of Tucson v. Koerber*, 82 Ariz. 347, 356, 313 P.2d 411, 420 (1957). Waiver of the right to enforce an agreed term is accomplished unilaterally while a modification or addition of a contract term requires agreement.

> The [party's] "waiver" ... is his own voluntary action; and in order to be legally effective, it is not necessary that the [other party] shall have given any consideration for it or shall have changed his position in reliance upon it.
>
> ....
>
> [I]t appears that "waiver" consists of the voluntary action of the obligor alone. A contractual modification by substituted agreement, requires the assent of both

parties, and it produces the usual effect of other valid contracts.

3A, Arthur L. Corbin, CORBIN ON CONTRACTS § 752 (1960).

> Parties to a contract can not, even by an express provision in the contract, deprive themselves of the power to alter or vary or discharge it by subsequent agreement. An express provision in a written contract that no recission or variation shall be valid unless it too is in writing is ineffective to invalidate a subsequent oral agreement to the contrary.... The promisor still has the power to waive the condition, or by his conduct to estop himself from insisting upon it....

*Id.* § 763.

The Digital salesperson's statement thus could still constitute a *waiver* of the right to enforce the Terms and Conditions form, even if there were no writing sufficient to *modify* the substance of the contract terms themselves.

We hold that genuine issues of material fact exist as to the meaning of the Work Statement language on "changes", the intent of the parties regarding the Terms and Conditions, and whether the statement of Digital's employee constituted a waiver of Digital's right to insist upon the Terms and Conditions.

### V.

■ Angus also contends that the eighteen-month limitation term may be excluded from the contract under the reasoning of *Darner Motor Sales, Inc. v. Universal Underwriters*, 140 Ariz. 383, 682 P.2d 388 (1984), and its progeny. Angus relies on *Darner* for the proposition that non-negotiated contract terms contrary to the parties' understanding or the purpose of the transaction are not binding.

The superior court rejected the *Darner* analysis. It found that this was not an adhesion contract and that the limitation term was neither unexpected nor incomprehensible.

In *Darner*, the Arizona Supreme Court adopted the RESTATEMENT (SECOND) OF CONTRACTS § 211 (1981) as a guide to analyzing

"contracts containing boiler-plate provisions which are not negotiated, and often not even read by the parties." *Darner*, 140 Ariz. at 391, 682 P.2d at 396. Based on *Darner*, the RESTATEMENT, and subsequent Arizona Supreme Court cases, we find that a genuine issue of material fact exists as to whether Digital had reason to believe Angus would not have assented to the limitation term if Angus had been aware of it.

Under RESTATEMENT § 211, with an important exception, a party who assents to a standardized contract "adopts the writing as an integrated agreement with respect to the terms included in the writing." The exception arises when the "other party has reason to believe that the party manifesting such assent would not do so if he knew that the writing contained a particular term, [and consequently] the term is not part of the agreement." RESTATEMENT § 211(3).

The comment to § 211(3) describes situations in which the assenting party may avoid a standardized term. It states:

> Although customers typically adhere to standardized agreements and are bound by them without even appearing to know the standard terms in detail, they are not bound to unknown terms which are beyond the range of reasonable expectation.... [A] party who adheres to the other party's standard terms does not assent to a term if the other party has reason to believe that the adhering party would not have accepted the agreement if he had known the agreement contained the particular term. Such a belief or assumption may be shown by the prior negotiations or inferred from the circumstances. Reason to believe may be inferred from the fact that the term is bizarre or oppressive, from the fact that it eviscerates the non-standard terms explicitly agreed to, or from the fact that it eliminates the dominant purpose of the transaction. The inference is reinforced if the adhering party never had an opportunity to read the term, or if it is illegible or otherwise hidden from view.

The Arizona Supreme Court, in *Gordinier v. Aetna Casualty & Surety Co.*, 154 Ariz. 266, 742 P.2d 277 (1987), held that the *Darner* and RESTATEMENT rule applies to unambiguous boilerplate terms. The rule may relieve a party from application of non-negotiated, standardized terms

> providing they were clauses which, "because of the nature of the enterprise, customers will not be expected to read and over which they have no real power of negotiation." The grounds for such relief—somewhat vaguely referred to as the reasonable expectations doctrine—include the factors described in Restatement § 211 and *Darner*. Accordingly, under Restatement § 211, courts will enforce a boilerplate term unless the drafter had reason to believe that the adhering party would not have assented to the particular term had he or she known of its presence. The drafter's reason to believe that the adhering party would not have assented to the term can be shown through prior negotiations or inferred from various facts.

.    .    .    .    .

> Arizona courts will not enforce even unambiguous boilerplate terms ... in a *limited* variety of situations:

.    .    .    .    .

> 2. Where the insured did not receive *full and adequate notice* of the term in question, and the provision is either unusual or unexpected, or *one that emasculates apparent coverage.*

*Id.* 154 Ariz. at 272, 742 P.2d at 283 (citations omitted) (emphasis to paragraph numbered "2" added).

Angus argues that the eighteen-month limitation term was an unknown term beyond the range of reasonable expectation; that Digital had reason to believe Angus would not have assented to the term because it is unusual and unexpected in a computer software transaction; and that Angus did not receive full and adequate notice of the term.

Digital's own correspondence tends to confirm that Angus had not had an opportunity to read the Terms and Conditions form before signing either the Work Statement or the Quotation. Indeed, the Terms

and Conditions were unilaterally presented to Angus as a "change," and both the Work Statement and the Quotation attempted to bind Angus to Terms and Conditions that Angus had never seen. This fact, coupled with evidence of prior negotiations or of the surrounding circumstances, at least raises an inference that Angus did not have notice of the term.

As to the unexpected nature of the term, Angus argued that an eighteen-month limitation term was not the industry standard. However, Angus did not present evidence of any industry-wide practice. Angus relied on the absence of a limitation term in its own contracts with clients as evidence of the unreasonable and unexpected nature of the term. In addition, Angus's president testified at his deposition that he would not have assented to the agreement had he known of the limitation term because it would be unworkable and unreasonable. However, Angus's own limited experience and opinion is simply not enough evidence of customary transactions in the computer software industry to support a reasonable inference that the term is unusual and unexpected. Moreover, we believe that whether a term is so unusual as to be unenforceable should be assessed by an objective standard and therefore cannot be shown by a mere avowal by the party seeking relief from the contract that in hindsight the party would not have agreed to the term.

On the other hand, a term may be shown to be "unusual or unexpected" not only by virtue of its rarity, but by how it affects the transaction. *See Gordinier,* 154 Ariz. at 273–74, 742 P.2d at 284. The limitation term imposed a dramatically shorter time for filing suit than the six-year period established by the Legislature for actions on written contracts.[2] *See* A.R.S. § 12–546. Statutes of limitation " 'are declarations of public policy as well as a private right …' " *Zuckerman v. Transamerica Ins. Co.,* 133 Ariz. 139, 143, 650 P.2d 441, 445 (1982).

Thus, the limitation term "emasculates" Angus's remedy against Digital by dramatically shortening the time period in which Angus was required to act on any contract claims. *See Zuckerman v. Transamerica Ins. Co.,* 133 Ariz. 139, 142–7, 650 P.2d 441, 444–9 (1982). The trier of fact could reasonably find that Angus was unfairly surprised by a boilerplate term beyond its reasonable expectation, and we therefore reverse the entry of summary judgment on this issue.

## VI.

█ We turn to Angus's final argument that the eighteen-month limitation term is unenforceable because it is unconscionable. Angus's tort claims were untimely under either the eighteen-month limitation term or the two-year limitation period prescribed by statute. Therefore, we will consider only whether the eighteen-month limitation term effectively bars Angus's contract claims.

"Unconscionability includes both procedural unconscionability, i.e. something wrong in the bargaining process, and substantive unconscionability, i.e. the contract terms per se." *Pacific American Leasing v. S.P.E. Bldg. Sys.,* 152 Ariz. 96, 103, 730 P.2d 273, 280 (App.1986). Angus argues that inclusion of the limitation term constitutes overreaching, oppression, and unfair surprise by Digital when viewed against Angus's inferior knowledge and lack of experience in software conversion matters.

The Arizona Supreme Court has adopted the Official Comment 1 to U.C.C. § 2–302 which states:

> The basic test [for unconscionability] is whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract.... The principle is one of the prevention of oppression and unfair surprise … and not of disturbance of allo-

---

**2.** In contrast, the limitation term reduced the period for filing a tort action from two years, A.R.S. § 12–542, to eighteen months, a reduction of only six months.

cation of risks because of superior bargaining power.

*Seekings v. Jimmy GMC*, 130 Ariz. 596, 602, 638 P.2d 210, 216 (1981) (quoting and following comment 1). Thus in the absence of both overreaching and superior bargaining power, the parties' agreement should not be disturbed by the court. *Id.*

As to Angus's contract remedies, the limitation term reducing the time in which Angus must pursue its claims from six years to eighteen months at first blush appears to be a harsh provision. But this reduction is not so severe that the term is unconscionable as a matter of law.[3]

Angus argues that *Salt River Project Agr. v. Westinghouse Elec.*, 143 Ariz. 368, 694 P.2d 198 (1984) supports its claim of unconscionability. However, in that case, Salt River Project argued that Westinghouse's disclaimer of liability for damages resulting from use of a Westinghouse-manufactured product was unconscionable. The Arizona Supreme Court held that commercial remedies may be completely disclaimed by a manufacturer and waived by the product user even when the waiver was unknowing. In essence, the court held it was not unconscionable for a seller to disclaim and a buyer to waive contract remedies; this result preserves freedom of contract and promotes the free flow of goods in society.[4]

If it is not unconscionable to waive or disclaim an entire category of remedies, *a fortiori* it is not unconscionable to shorten the time within which a party must exercise those remedies.

The superior court held that Angus failed to come forward with evidence that the eighteen-month limitation was unconscionable. We agree with the superior court and the Washington Court of Appeals, which said:

> If the material facts are undisputed, and when looked at in the light most favorable to the party alleging unconscionability are insufficient to establish unconscionability, there is no need for the superior court to inquire further. Absent a threshold showing of unconscionability sufficient to survive summary judgment, the issue disappears from the case.

*Jeffery v. Weintraub*, 32 Wash.App. 536, 541, 648 P.2d 914, 919 (1982). In the context of a motion for summary judgment, when Angus failed to produce sufficient evidence to establish unconscionability, the entry of judgment on this issue was proper.

### VII.

In conclusion, we find that the superior court correctly held that Angus's cause of action in tort was barred.

---

**3.** Unconscionability is a question of law for the court to decide. Comment (f) to § 208 of the RESTATEMENT OF CONTRACTS provides:

> A determination that a contract or term is unconscionable is made by the court in the light of all the material facts. Under the Uniform Commercial Code § 2–302, the determination is made "as a matter of law," but the parties are to be afforded an opportunity to present evidence as to commercial setting, purpose and effect to aid the court in its determination. Incidental findings of fact are made by the court rather than by a jury....

Section 2–302(A) of the U.C.C. (A.R.S. § 47–2302(A) provides as follows:

> If the court as a matter of law finds the contract or any clause to have been unconscionable at the time it was made, the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

Although our case is not governed by the U.C.C. because it involves the sale of professional services rather than the sale of goods, the U.C.C. is instructive. The allocation of responsibility to the court is sensible because the public policy goal of preserving freedom of contract is best served by minimizing legal interference in the private bargaining process. *See Salt River Project Agr. v. Westinghouse*, 143 Ariz. 368, 376, 694 P.2d 198, 206 (1984). Uniform Laws Annotated, U.C.C. § 2–302, Official Comment 3.

**4.** In contrast, however, because of public policy concerns reflected in the law of products liability, and because tort remedies are created by law and are not bargained for, tort claims may not be so easily waived. *See Salt River Project*, 143 Ariz at 382–83, 694 P.2d at 212–213. In *Salt River Project*, the court did not decide whether Westinghouse's disclaimer of tort remedies was unconscionable. The court remanded the case to the superior court for factual findings on whether the parties had roughly equal bargaining power, had bargained over the specifications of the product, and in fact had bargained for the disclaimer.

Angus's cause of action for breach of contract accrued at the latest when Digital severed all business relations with Angus at the end of 1984. However, if the eighteen-month limitation term did not become a part of the contract, was effectively waived by Digital's employee, or should be excluded under *Darner* and *Gordinier*, then Angus may rely on the six-year limitation period established by the legislature. We therefore reverse entry of summary judgment with regard to the contract claims and remand to the superior court for trial on these issues.

KLEINSCHMIDT, J., concurs.

GERBER, Judge, dissenting in part:

While I concur with most aspects of the majority's resolution of this case—difficult in itself and made more so by appellate argument—I am compelled to dissent respectfully from my colleagues in the following two respects: (1) as to whether the terms and conditions became part of the parties' contract, and (2) as to whether the *Darner* analysis raises a material question of fact.

As to the first issue, the majority concludes that there are unspecified fact questions that prevent it from deciding whether Digital's terms and conditions became part of the original contract (the "Work Statement") consummated in March 1983. While one can readily generate interesting factual speculations about how this dispute could have been avoided, I find none of them truly "material" under Rule 56. The necessary material facts are before us. In my view, there are several separate reasons why Digital's terms and conditions cannot as a matter of law be part of the parties' contract of March 1983.

The first reason is that these terms and conditions were not made part of the original contract of March 1983; they are on a separate document which Dr. Jacoby, Angus' president, states under oath he neither saw nor discussed, a statement which on appellate review from an adverse summary judgment must be taken favorably to him. The reference in the work statement to familiarity with the "terms and conditions"

above Dr. Jacoby's signature cannot bind Angus in view of Jacoby's affidavit that he was unaware of any such document, including its 18-month limitation period.

Secondly, Digital's May 30, 1983 letter to Angus which enclosed this terms and conditions document refers twice to this document explicitly as a "change" from the March contract. Digital's "change" terminology reinforces the conclusion that these terms and conditions enclosed with its May 30 letter were not part of the original March contract. At a minimum Digital's "change" language means that Digital itself did not consider the terms and conditions enclosed in its May letter to be part of the original contract two months earlier. Put differently, Digital's desire for a contractual "change" in order to incorporate the terms and conditions belies its claim that these same terms and conditions were already incorporated in the March agreement, i.e., one would seek to incorporate these terms only because they were not incorporated in the March agreement.

Third, after the May correspondence, the parties did not comply with their own contractual requirements for changing their original contract. The terms and conditions enclosed with Digital's May 30 letter were not "mutually agreed on" nor "mutually acceptable," nor were they "jointly negotiated" nor, indeed, was any resulting change ever put in "writing" by the two representatives the parties designated as having the exclusive right to negotiate such changes to the contract.

There is further legal reason for denying inclusion of the terms and conditions, namely, Sambrone's statement, on behalf of Digital, to Angus employee Kelley that these terms and conditions did not apply to Angus. This statement is never denied by Digital. It is clear on its face. Its meaning is reinforced even more by the parties' subsequent consistent conduct: they take no steps whatsoever to "mutually negotiate", "mutually agree," or render any such changes in writing by the designated negotiators as they bound themselves to do if they intended to change the original March contract.

Because these terms never became part of the parties' contract, the specific term limiting the statute of limitations to 18 months did not become part of the contract and, therefore, I would find that the Angus contractual claim survives the 18–month statute of limitations.

It is true that Angus made neither a cross motion for summary judgment nor any precise contract formation argument in the trial court and only most obliquely in this court. However, though it happens rarely, summary judgment may be entered against the moving party and in favor of the nonmoving party. *Johnson v. Collins,* 11 Ariz.App. 327, 464 P 2d 647 (1970). Such is exactly what the trial court should have done on this contract formation issue.

Secondly, because of the conclusion above, I disagree that the *Darner* analysis raises any question of material fact, nor to my mind is it a necessary or even helpful component for resolving this case. Prescinding from whether the "reasonable expectation" test fits at all workably in this context, I can see on these facts no expectation by any truly reasonable person that the belated terms and conditions of May 1983 were really intended to be part of the original contract of two months earlier. Sending the case back to the trial court so the parties can reshape (or even create) and then recount their expectations on this issue nine years after the fact strikes me as fruitless an exercise as it is predictable. Such a remand is unnecessary once one reaches what I take as the proper legal conclusion that the terms and conditions of May 1983 simply never became part of the March 1983 contract.