338

903 P.2d 646

Jane S. WILLIAMS–CARTER,
Plaintiff/Appellant,

v.

MARICOPA COUNTY; Roy R. Pederson, Maricopa County Manager, in his Official and Individual Capacity; Tom Freestone, Maricopa County Supervisor, in his Official and Individual Capacity; Betsey Bayless, Maricopa County Supervisor, in her Official and Individual Capacity; James D. Bruner, Maricopa County Supervisor, in his Official and Individual Capacity; Ben Arrendondo, Maricopa County Supervisor, in his Official and Individual Capacity; Carole Carpenter, Maricopa County Supervisor, in her Official and Individual Capacity, Defendants/Appellees.

No. 2 CA–CV 95–0148.

Court of Appeals of Arizona, Division 2, Department A.

Sept. 7, 1995.

Joseph L. Esposito, Tucson, for plaintiff/appellant.

Maricopa County Attorney by Mary C. Cronin, Deputy County Attorney, Phoenix, for defendants/appellees.

OPINION

PELANDER, Judge.

The issue presented in this case is whether appellee Maricopa County's (the County) rejection of appellant's application for the position of clerk of the County's Board of Supervisors (the Board), based on appellant's political affiliation, violated her First Amendment right to freedom of association and expression. The trial court, concluding that it did not, granted summary judgment for the County. For the reasons stated below, we affirm.

FACTS AND PROCEDURAL HISTORY

Appellant, a registered Democrat employed as clerk of the Pima County Board of

Supervisors, applied for the announced open position of clerk of the Maricopa County Board of Supervisors in April of 1991. Although appellant met the announced position requirements, was otherwise qualified for the job and was included on a short list of sixteen candidates out of 190 applicants, she was denied an interview because of her political affiliation. Based on instructions from the Republican majority members of the Board, the position ultimately was filled by a person from a final list of seven candidates consisting entirely of Republicans.

The County "Job Announcement" for the clerk opening outlined a wide range of duties for the position, including the following: administering and supervising activities related to supporting the Board of Supervisors; recording and maintaining the official records of the Board; administering the Board of Equalization (BOE) process; interfacing with elected officials, county department heads and other government agencies; directing administrative duties related to the BOE process, including planning and program enhancements; preparing the BOE budget; developing and implementing policies and procedures; recruiting and supervising hearing officers and on-call staff; notifying parties of hearing results; maintaining hearing records and correspondence; and performing other duties required by law or assigned by county management.

The outgoing clerk of the Board, who had served in the position for nine years, described the clerk's primary duties as follows:

To attend all Board meetings, to transcribe the minutes of those meetings, to publish the minutes of those meetings, at the time the Clerk's Office was responsible for preparing the agenda of the meetings and distributing the agenda of the meetings, and then consequently processing and distributing the paperwork that resulted from the agenda items. To act as Clerk for the Board of Equalization and to arrange for the Board of Equalization hearings to be held. Recruiting hearing officers and training them and generally administering the Clerk's Office on behalf of

the Board of Supervisors, including keeping all records of the Board.

She also listed the following additional responsibilities she performed during her tenure as clerk:

— Placing statutory items on the agenda without consulting the Board of Supervisors;

— Administering the County records management program;

— Organizing the BOE hearings and generating all paperwork resulting from those hearings;

— In her role as clerk to the BOE, negotiating with tax consultants from the Department of Revenue and with the legislature;

— Annually lobbying the legislature to amend the laws concerning the BOE, often leading to negotiations over proposed legislation with tax consultants and attorneys, and sometimes negotiating for proposed amendments to the rules and procedures;

— Periodically appearing before state legislative committees in relation to duties with the BOE.

According to the former clerk, the position historically has "always been a political appointment." She indicated that political affiliation made a difference in the clerk's duties or conduct in two primary areas: when the clerk was called upon to vote for a replacement Board member in the event of a vacancy, and when the Board met in executive sessions and confidentiality was required. In November 1989 and again in June 1991, the Board's clerk was required to vote for a new, replacement supervisor following a vacancy on the Board. The clerk's authority to vote under those circumstances, and the interest of majority party Board members in having a clerk who shared a similar political philosophy, made the clerk's political party affiliation important, at least in the view of those Board members.

In her complaint, appellant alleged *inter alia* a deprivation of her civil rights under 42 U.S.C. § 1983,[1] contending that appellees un-

---

1. 42 U.S.C. § 1983 provides in part: "Every person who, under color of any statute, ... cus-

tom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United

constitutionally "employed a political affiliation test to [her] application and eliminated her from contention after ascertaining that she was a registered Democrat."[2] In granting summary judgment for appellees on that claim, the trial court found "that the nature of the job of the Clerk of the Board of Supervisors is such that it is not discrimination to require that such a person be registered with such political party as the Board chooses." This appeal followed.

## Standard of Review

■■■ On appeal from a summary judgment we must determine *de novo* whether there are any genuine issues of material fact and whether the trial court erred in its application of the law. *United Bank v. Allyn*, 167 Ariz. 191, 805 P.2d 1012 (App.1990). We view the evidence in a light most favorable to the party against whom summary judgment was entered, and all favorable inferences fairly arising from the evidence must be given to that party. *Angus Medical Co. v. Digital Equip. Corp.*, 173 Ariz. 159, 840 P.2d 1024 (App.1992). We also review *de novo* the trial court's rejection of appellant's constitutional claim under § 1983. *Whitmore v. Gaines*, 24 F.3d 1032, 1033 (8th Cir.1994).

## Discussion

The clerk of a county's board of supervisors is one of nine county officers enumerated by state law. *See* A.R.S. § 11-401. The clerk is "an appointive statutory official," *State ex rel. Stidham v. Kalil*, 85 Ariz. 365, 366, 339 P.2d 396, 397 (1959), who serves at the board's will and pleasure. *Hawke v. Wentworth*, 4 Ariz. 317, 324, 39 P. 809 (1895). The clerk's mandatory statutory duties are outlined in A.R.S. § 11-241, which concludes by requiring the clerk to "[p]erform all other duties required by law or rule or order of the board." A.R.S. § 11-241(9). Arizona statute also sets forth another mandatory, potential role of the clerk:

When a vacancy occurs in the office of supervisor, the remaining supervisors, *together with the clerk of the board of supervisors*, shall fill the vacancy by appointment of a resident of the district in which the vacancy occurred.

A.R.S. § 11-213(B) (emphasis supplied). As noted earlier, twice in the past several years the Maricopa County clerk has been required to vote for a replacement supervisor due to a vacancy on the Board, and the clerk's voting power in such a contingency was considered very important to the Board members at the time of appellant's application.

The United States Supreme Court has held in a plurality opinion that patronage dismissals of public employees are permissible only when the employee holds a "policymaking" position. *Elrod v. Burns*, 427 U.S. 347, 367–68, 372, 96 S.Ct. 2673, 2687, 2689, 49 L.Ed.2d 547, 562, 565 (1976). Acknowledging that "[n]o clear line can be drawn between policymaking and nonpolicymaking positions," the Court in *Elrod* stated:

An employee with responsibilities that are not well defined *or are of broad scope* more likely functions in a policymaking position. In determining whether an employee occupies a policymaking position, consideration should also be given to whether the employee acts as an adviser or formulates plans for the implementation of broad goals.

*Elrod*, 427 U.S. at 368, 96 S.Ct. at 2687, 49 L.Ed.2d at 562 (emphasis supplied). One interest recognized by the Court as potentially justifying patronage dismissal of public employees in policymaking positions is "the need for political loyalty of employees, not to the end that effectiveness and efficiency be insured, but to the end that representative government not be undercut by tactics obstructing the implementation of policies of the new administration, policies presumably sanctioned by the electorate." *Elrod*, 427 U.S. at 367, 96 S.Ct. at 2687, 49 L.Ed.2d at 562. The Court in *Elrod* also established a

States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action of law, suit in equity, or other proper proceeding for redress."

2. Appellant's claims for employment discrimination under 42 U.S.C. § 2000e *et seq.* and A.R.S. § 41-1463 were dismissed without prejudice pursuant to stipulation and are not in issue on this appeal.

strict scrutiny standard for examining patronage dismissals, noting that "if conditioning the retention of public employment on the employee's support of the in-party is to survive constitutional challenge, it must further some vital government end by a means that is least restrictive of freedom of belief and association in achieving that end, and the benefit gained must outweigh the loss of constitutionally protected rights." *Elrod,* 427 U.S. at 363, 96 S.Ct. at 2685, 49 L.Ed.2d at 559–60. As one court has noted: "As a result of Elrod the courts have been called upon to determine the extent of the employee's responsibilities, whether the responsibilities are narrowly or broadly defined, and whether the employee 'acts as an adviser or formulates plans for the implementation of broad goals.' This has proved to be a difficult task." *Newman v. Voinovich,* 789 F.Supp. 1410, 1418 (S.D.Ohio 1992), *aff'd* 986 F.2d 159 (6th Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 3041, 125 L.Ed.2d 727 (1993) (quoting *Elrod,* 427 U.S. at 368, 96 S.Ct. at 2687, 49 L.Ed.2d at 562).[3]

In 1980, the Supreme Court re-visited this area and held that patronage employment decisions are permissible if "the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti v. Finkel,* 445 U.S. 507, 518, 100 S.Ct. 1287, 1295, 63 L.Ed.2d 574, 584 (1980). Elaborating on the "policymaker" analysis, the Court noted that "if an employee's private political beliefs would interfere with the discharge of his public duties, his First Amendment rights may be required to yield to the State's vital interest in maintaining governmental effectiveness and efficiency." *Branti,* 445 U.S. at 517, 100 S.Ct. at 1294, 63 L.Ed.2d at 583 (citing *Elrod,* 427 U.S. at 366, 96 S.Ct. at 2686, 49 L.Ed.2d at 561).

*Branti* and *Elrod* were extended to job applicants, or new hires, in *Rutan v. Repub-*

*lican Party of Illinois,* 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990). The Court in *Rutan* held, *inter alia,* that rejection of an employment application for a job as a prison guard because the applicant chose not to support the Republican Party would violate the latter's First Amendment rights in the absence of any demonstration by the state of any "vital interest" or "justification" for "conditioning hiring decisions on political belief and association." *Rutan,* 497 U.S. at 78–79, 110 S.Ct. at 2739, 111 L.Ed.2d at 68–69. The Court suggested, however, that political affiliation and viewpoint are permissible employment criteria for positions involving "policymaking *and confidential employees.*" *Rutan,* 497 U.S. at 71 n. 5, 110 S.Ct. at 2735 n. 5, 111 L.Ed.2d at 64 n. 5 (emphasis supplied).

■ Several factors are pertinent in determining whether political affiliation is a permissible criterion for a public employee hiring decision. First, "we must examine the inherent duties of [the] position *and* the duties that the new holder of that position will perform." *Faughender v. City of North Olmsted, Ohio,* 927 F.2d 909, 913 (6th Cir. 1991) (emphasis in original). The work, assignments or responsibilities actually performed by a particular employee are not dispositive. *Id.; Stott v. Haworth,* 916 F.2d 134, 142 (4th Cir.1990) (quoting *Jimenez Fuentes v. Torres Gaztambide,* 807 F.2d 236, 241–42 (1st Cir.1986)). Thus, appellant's experience and job duties as clerk of the Pima County Board of Supervisors are not controlling.

■ Based on the evidence presented, including the County's "Job Announcement," the clerk position at issue here involved much more than simply ministerial duties. The job required close contact with the Board, knowledge of the Board's confidential decisions, policymaking relating to operation of the BOE, interfacing with elected officials

---

**3.** The term "policymaker" has been referred to "as a 'convenient shorthand' for a government employee who occupies a position for which party affiliation, loyalty or confidence are appropriate." *Kaluczky v. City of White Plains,* 57 F.3d 202, 208 (2d Cir.1995) (city personnel officer occupied "policymaking" position who held office "at the will of [his] employer, and may be

discharged by reason of political affiliations, political beliefs, ideological viewpoints or partisan activity."). *See also Affrunti v. Zwirn,* 892 F.Supp. 451 (E.D.N.Y.1995); *Matthews v. Town of Blooming Grove,* 882 F.Supp. 1420 (S.D.N.Y. 1995) (failure to reappoint town supervisor's bookkeeper/clerk based on her political affiliation did not violate First Amendment).

and other government agencies, and generally supporting the Board's actions and decisions. It was not unreasonable in our view for the Board to conclude that effective, satisfactory fulfillment of these varied duties might be compromised if the clerk's political affiliation and philosophy differed from that of the Board's majority members.

Second, confidentiality of the position is a relevant factor. Not only is there a wide range of responsibilities associated with the job, the clerk also regularly attends confidential executive sessions of the Board. Thus, the clerk qualifies as a confidential employee whose appointment may be based on patronage factors. *See Meeks v. Grimes,* 779 F.2d 417, 420 (7th Cir.1985) ("[P]olitics is a constitutionally permissible job criterion" for "confidential" positions, which "encompases [*sic* ] those government employees who, while not decision makers, are in close contact with policymakers and the highly confidential communications or records affecting decisions.").

Third, the fact that the clerk's job is a non-merit, appointive position also weighs in favor of allowing political affiliation to affect hiring decisions for that position. *See Stott,* 916 F.2d at 142; *Affrunti,* 892 F.Supp. at 458. Fourth, and of paramount importance in our view, the clerk's statutory power under A.R.S. § 11–213(B) to vote for a replacement supervisor in the event of a vacancy on the Board justified patronage considerations in the clerk appointment process. That authority unquestionably implicates political factors, such that the Board's determination to include political affiliation as a criterion in the selection and appointment of a new clerk was not only understandable but also constitutionally permissible. Given the clerk's power under § 11–213(B) as well as the wide array of duties and functions associated with the clerk's position, its confidential nature, and the fact that the clerk serves at the

Board's will and pleasure and is expected to promote and advance its policies and directives, the trial court did not err in concluding as a matter of law that the Board's decision to limit the position to Republican applicants did not violate appellant's constitutional rights.[4]

While political affiliation may have little if any practical effect on performance of the clerk's routine statutory and ministerial duties, the County sufficiently demonstrated that this is "a position for which party affiliation, loyalty or confidence are appropriate." *Kaluczky,* 57 F.3d at 208. Because there is "a rational connection between shared ideology and job performance," political affiliation was a legitimate criterion for the Board's clerk appointment. *Savage v. Gorski,* 850 F.2d 64, 68 (2nd Cir.1988). Therefore, the trial court did not err in concluding that the Board could constitutionally "require that [a new clerk appointee] be registered with such political party as the Board chooses." The trial court's judgment is affirmed. In the exercise of our discretion, we decline to award attorneys' fees under 42 U.S.C. § 1988.

LIVERMORE, P.J., concurs.

FERNANDEZ, Judge, specially concurring.

I concur that the position at issue in this case is a policy making position and the court has ruled correctly. I write only to caution against expanding this rule to other public employees.

---

4. Courts have upheld patronage dismissals for a wide variety of governmental positions, including the following: assistant district attorney, city solicitor and assistant solicitor, city corporation council, assistant state attorney, deputy city attorney, assistant city attorney, town solicitor and assistants, workers compensation law judge, legal assistant to the clerk of the circuit court's office, deputy sheriff, trial judge's bailiff, coordinator for pretrial services, police captain, governor's editing assistant, executive secretary in the office of cultural affairs, personal secretary, confidential secretary to the director of county correctional facility, and many others. *See Martin, A Decade of Branti Decisions: A Governmental Officials Guide to Patronage Dismissals,* 39 Am. U.L.Rev. 11, 44–46 (1989); *Stott,* 916 F.2d at 144.