212 P.3d 865 (2009)
HUGHES CUSTOM BUILDING, L.L.C. and John Hughes and Amalia Pineres, M.D., husband and wife, Plaintiffs/Appellants,
v.
James DAVEY and James Davey and Associates, Inc., Defendants/Appellees.
No. 2 CA-CV 2008-0103.
Court of Appeals of Arizona, Division 2, Department B.
May 7, 2009.
*866 Thompson, Montgomery & DeRose By Jerry B. DeRose, Globe, Attorney for Plaintiffs/Appellants.
Bonnett, Fairbourn, Friedman & Balint, P.C. By Andrew Q. Everroad and Meredith L. Vivona, Phoenix, Attorneys for Defendants/Appellees.

OPINION
BRAMMER, Judge.
¶ 1 Appellants Hughes Custom Building, L.L.C., John Hughes, and Amalia Pineres (collectively, "Hughes") appeal from the trial court's grant of summary judgment in favor of appellees James Davey and James Davey and Associates, Inc. (collectively, "JDA"). Hughes argues the trial court erred in applying *867 the economic loss doctrine to bar its tort claims against JDA and in concluding it lacked standing to assert certain damages. We affirm in part, reverse in part, and remand the case to the trial court.

Factual and Procedural Background
¶ 2 We view the facts in the light most favorable to the party opposing summary judgment and draw all reasonable inferences arising from the evidence in favor of that party. See Prince v. City of Apache Junction, 185 Ariz. 43, 45, 912 P.2d 47, 49 (App. 1996). JDA is a civil engineering firm that had performed various engineering services at the Sunset View real estate subdivision in Globe, Arizona, under a contract with the subdivision's developers. In 1997, Hughes purchased two lots in the subdivision and constructed houses on those lots. In 1999, Hughes sold one of the houses to James and Mary Bernstein, and in 2001 sold the other to Brian and Lindy Francom.
¶ 3 In 2004, the Bernsteins sued Hughes and JDA for breach of implied warranty, breach of contract, negligence, and unjust enrichment, alleging, inter alia, that "improper compaction of the subdivision land [had] resulted in soil subsidence and structural damage" to their house. In 2005, Hughes and the Bernsteins settled and, pursuant to the settlement agreement, the Bernsteins' claims against JDA were dismissed with prejudice. The settlement agreement also provided that Hughes would transfer a house, also located in the Sunset View subdivision, to the Bernsteins and that the Bernsteins would "transfer title and possession of [the home they had purchased from Hughes back] to [Hughes]." In 2003, the Francoms filed a complaint against Hughes with the Arizona Registrar of Contractors, asserting the house they had purchased from Hughes was suffering structural damage from excessive settling. The Registrar revoked Hughes' license, finding that, although Hughes had initially attempted to correct the damage caused by settling and to prevent further damage, Hughes had failed to respond appropriately after the Registrar had issued a "Corrective Work Order."
¶ 4 In 2002, Hughes filed an action against the City of Globe, which had approved the subdivision plat before he purchased the lots, asserting the City had negligently approved the subdivision and provided incorrect information regarding the "excavation, fill and compaction" of the subdivision lots. Hughes later amended its complaint to include a "malpractice" claim against JDA. In 2004, the trial court granted the City's motion for summary judgment, concluding the economic loss doctrine prevented Hughes from recovering from the City and, in any event, Hughes had not filed a notice of claim or his action within time limits prescribed by A.R.S. §§ 12-821 and 12-821.01(A).
¶ 5 In 2006, Hughes filed a second amended complaint, asserting a negligence claim against JDA alleging it had breached its duty to both "ensure that the subdivision lots could be used for the construction of single family residences," and determine whether the lots "met minimum requirements for compact and soil expansion," and that it had also failed to "advise the public ... of any conditions that would prevent the development of the lots as reasonably anticipated." Hughes also alleged JDA had breached an implied warranty "that [it had] exercise[d][its] skill with care and diligence and in a reasonable, non-negligent manner" in performing its contract with the subdivision developers. Hughes asserted as damages "[p]ast and future lost income," "[e]xpenses incurred in an attempt to prevent further subsidence," "[p]enalties imposed by the Arizona Registrar of Contractors," "[l]iability incurred by [Hughes] to the purchasers of the residential structures," "[d]amages paid to the purchasers of the residential structures," and "[a]ttorney fees and costs."
¶ 6 JDA filed a motion for partial summary judgment, asserting Hughes did not have "standing to bring an action seeking the lost value" of the houses sold to the Bernsteins and Francoms "or the costs to demolish [them]." JDA argued that, in order to have standing, Hughes had to prove it had sustained "particularized injuries," and could not do so because neither the Bernsteins nor the Francoms had assigned to Hughes any potential claims they might have had against *868 JDA. Hughes responded that it "ha[d] not filed this action on behalf" of the homeowners, and instead sought compensation for its own losses, which "include[d] the damages Hughes must pay to the Francom[s] for breach of the implied warranty of habitability and for the loss of the value of the ... home [Hughes] [had] given to the Bernstein[s] to satisfy the judgment obtained by the Bernstein[s] against Hughes." The trial court granted JDA's motion and instructed JDA to "prepare findings of fact and conclusions of law to present to the Court for signature." The court signed JDA's proposed "findings of fact and conclusions of law,"[1] which stated the statute of limitations barred any potential claims the Francoms might have had against JDA, the Francoms and Bernsteins had not assigned any claims to Hughes and, thus, Hughes "had no standing to assert as damages the alleged lost value" of either house.
¶ 7 JDA subsequently filed two more motions for partial summary judgment, asserting the economic loss doctrine as a bar to Hughes' negligence and breach of implied warranty claims. The court granted both motions and, again, adopted JDA's proposed findings of fact and conclusions of law. The court, relying on Carstens v. City of Phoenix, 206 Ariz. 123, 75 P.3d 1081 (App.2003), concluded the economic loss doctrine precluded Hughes' claims because Hughes had "not allege[d] any personal injury or secondary property loss resulting from JDA's alleged negligence [or breach of implied warranty]." The court entered final judgment in favor of JDA, awarding it $3,390.80 in costs. This appeal followed.

Discussion
¶ 8 Summary judgment is proper when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Ariz. R. Civ. P. 56(c)(1). A court should grant summary judgment "if the facts produced in support of the claim or defense have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim or defense." Orme Sch. v. Reeves, 166 Ariz. 301, 309, 802 P.2d 1000, 1008 (1990). We review de novo whether there are any genuine issues of material fact and whether the trial court applied the law properly. Brookover v. Roberts Enters., Inc., 215 Ariz. 52, ¶ 8, 156 P.3d 1157, 1160 (App.2007).

Economic Loss Doctrine
¶ 9 Hughes argues the trial court erred in ruling the economic loss doctrine precluded recovery on its negligence claim.[2] The economic loss doctrine precludes a party from recovering in tort if the party has suffered only an economic loss and, therefore, should pursue its remedy in contract instead of in tort. See generally Salt River Project Agric. Improvement & Power Dist. v. Westinghouse Elec. Corp., 143 Ariz. 368, 376-79, 694 P.2d 198, 206-09 (1984), abrogated on other grounds by Phelps v. Firebird Raceway, Inc., 210 Ariz. 403, 111 P.3d 1003 (2005); Carstens, 206 Ariz. 123, ¶ 10, 75 P.3d at 1083-84.
¶ 10 Hughes asserts the economic loss doctrine does not apply to its negligence claim against JDA because there is an "exception" to the doctrine for negligence by "design professionals." Hughes relies on Donnelly Construction Co. v. Oberg/Hunt/Gilleland, 139 Ariz. 184, 677 P.2d 1292 (1984), rejected in part by Gipson v. Kasey, 214 Ariz. 141, *869 150 P.3d 228 (2007). In Donnelly, our supreme court determined that "[d]esign professionals have a duty to use ordinary skill, care, and diligence in rendering their professional services," 139 Ariz. at 187, 677 P.2d at 1295, and are liable for "foreseeable injuries to foreseeable victims which proximately result from their negligent performance of their professional services." Id. at 188, 677 P.2d at 1296.[3] Thus, the court concluded, a construction contractor could bring a negligence action against a design professional for increased construction cost caused by a faulty site plan  even in the absence of a contract between the contractor and designer. Id. at 185-86, 188, 677 P.2d at 1293-94, 1296.
¶ 11 The supreme court, however, did not discuss whether the economic loss doctrine could apply to preclude such an action. But Division One of this court recently reached this question, and, relying in part on Donnelly, held the doctrine did not bar recovery in a negligence action against an architect for defects in design, as opposed to defects in construction. Flagstaff Affordable Hous. Ltd. P'ship v. Design Alliance, Inc., ___ Ariz. ___, ¶¶ 28, 30, 212 P.3d 125, ___, ___ (App.2009). There, the architect had provided the builder with a plan for an apartment complex that did not comply with federal regulations and, after completing construction, the builder incurred significant additional costs to correct the deficiencies. Id. ¶¶ 2-3. Division One noted the architect's duty "ar[o]se independently of any contract" and, therefore, "the purpose of the economic loss doctrine  maintaining a distinction between tort and contract actions  is not implicated." Id. ¶ 14. The court also reasoned that application of the economic loss doctrine would "erod[e]" the architect's general duty, as a professional with "special skill and knowledge," to use reasonable care in rendering his or her services. Id. ¶¶ 15-16.
¶ 12 Hughes' claim rests in part on JDA's alleged conduct in performing "grading and drainage improvement[] design" of the subdivision lots. Therefore, under Flagstaff Affordable Housing, to the extent Hughes' claims are based on negligent design, the economic loss doctrine arguably does not apply. But Hughes' claim is not limited to negligent design; Hughes also asserts JDA had a duty to determine whether the lots were suitable for their intended use  construction of single-family residences  and also had a duty to advise the public of any conditions that would prevent that use. Hughes contends JDA's violation of those duties resulted in structural damage to the houses Hughes had constructed on the lots. In this respect, Hughes' claims resemble those at issue in Carstens, where Division One of this court concluded the economic loss doctrine barred a negligence claim against city inspectors for failing to detect construction defects when those defects did not cause any personal injury or damage to secondary property.[4] 206 Ariz. 123, ¶¶ 28-29, 75 P.3d at 1087.
¶ 13 We need not determine, however, whether Hughes' negligence claim is properly characterized as one for negligent design, construction, inspection, or some combination thereof. Nor need we decide whether those distinctions are or should be meaningful in determining whether the economic loss doctrine applies. Even assuming, without deciding, *870 that the economic loss doctrine does apply in an action against an engineering firm for negligent planning and inspection, it does not bar Hughes' claim.
¶ 14 Relying on Carstens, JDA argues the economic loss doctrine precludes Hughes' claim because Hughes "allege[s] only economic damages and no personal injury or secondary property loss." See Carstens, 206 Ariz. 123, ¶ 10, 75 P.3d at 1083 ("The economic loss rule bars a party from recovering economic damages in tort unless accompanied by physical harm, either in the form of personal injury or secondary property damage."); see also Flagstaff Affordable Hous., ___ Ariz. ___, ¶ 9, ___ P.3d at ___ (citing Carstens); Nastri v. Wood Bros. Homes, Inc., 142 Ariz. 439, 444-45, 690 P.2d 158, 163-64 (App.1984) (no valid negligence claim where "damage claimed ... involve[d] the structure itself" and not "damage to personal property or personal injury"). However, as we recently explained in Valley Forge Insurance Co. v. Sam's Plumbing, LLC, 220 Ariz. 512, ¶¶ 10-11, 207 P.3d 765, ___ - ___ (App.2009), Carstens's articulation of the economic loss doctrine is contrary to our supreme court's decision in Salt River, 143 Ariz. 368, 694 P.2d 198.[5]
¶ 15 Determination of whether the economic loss doctrine applies does not rest solely on whether there was a personal injury or damage to secondary property. See Valley Forge, ___ Ariz. ___, ¶ 7, ___ P.3d at ___ (claim may sound in tort even if "only property damaged is the defective product itself"). Instead, courts should determine, on a case-by-case basis, whether the claim brought properly sounds in tort or in contract. Id. ¶ 5. In doing so, we analyze three factors: "(1) the nature of the defect causing loss, (2) how the loss occurred, and (3) `the type of loss for which the plaintiff seeks redress.'"[6]Id. ¶ 7, quoting Salt River, 143 Ariz. at 376, 694 P.2d at 206.
¶ 16 We begin with the third factor because our discussion of that factor informs our analysis of the first. The third factor examines the nature of the loss. "Where economic loss, in the form of repair costs, diminished value, or lost profits, is the plaintiff's only loss, the policies of the law generally will be best served by leaving the parties to their commercial remedies." Salt River, 143 Ariz. at 379, 694 P.2d at 209. But, "[w]here economic loss is accompanied by physical damage to person or other property,... the parties' interests generally will be realized best by the imposition of ... tort liability." Id. at 379-80, 694 P.2d at 209-10. Thus, the question to be answered here is whether the Bernstein and Francom houses constitute "other property," separate from the lots upon which they were built. See id.
¶ 17 In applying the economic loss doctrine in construction cases, some courts have treated the house and its component parts as a single property. Thus, when a defect of a particular part of the house results in damage to the remainder of the house, no negligence action is permitted for that additional damage. See, e.g., Nastri, 142 Ariz. at 440, 444, 690 P.2d at 159, 164 (economic loss rule bars negligence claim by homeowner against homebuilder for damage caused by soil subsidence; homeowner must show harm "beyond disappointed expectations and loss of the benefit of the bargain in the purchase of a new home"); Prendiville v. Contemporary Homes, Inc., 32 Kan.App.2d 435, 83 P.3d 1257, 1258-59, 1264 (2004) (defective siding installed by homebuilder part of house; tort action for damage caused by flooding barred by economic loss doctrine); Linden v. Cascade Stone Co., 283 Wis.2d 606, 699 N.W.2d 189, ¶¶ 27-28 (2005) (economic *871 loss doctrine barred tort claim for water damage to home caused by faulty stucco because plaintiffs "bargained for the finished product, a house; not its various components"). But the case before us differs from those cases in a significant way  Hughes did not purchase houses, only empty lots upon which the ultimately damaged houses were constructed. Thus, we must determine whether, by constructing houses on those lots, Hughes has integrated the houses with the lots such that they should be considered a single item of property for application of the economic loss doctrine.
¶ 18 We have discovered few cases addressing the economic loss rule in the construction context that are readily analogous to the situation before us. See, e.g., Moffitt v. Icynene, Inc., 407 F.Supp.2d 591, 596, 600-01 (D.Vt.2005) (owner assembling prefabricated cabin contracted with insulation installer; economic loss doctrine did not bar claim against installer when faulty insulation damaged rest of cabin); Gunkel v. Renovations, Inc., 822 N.E.2d 150, 155-56 (Ind. 2005) (declining to apply economic loss doctrine to bar claim for damage caused to home by defective installation of stone facade). But, we find the analysis in Gunkel particularly instructive. There the court noted, "The central theory underlying `economic loss' is that the law should permit the parties to a transaction to allocate the risk that an item sold or a service performed does not live up to expectations." Gunkel, 822 N.E.2d at 155. Thus, the court observed, damage to the product itself was recoverable only in contract, but damage to other property was recoverable in tort. Id. at 155-56. "Other property," however, does not include "other parts of a finished product damaged by components supplied to the seller by other manufacturers and imported into the seller's product." Id. at 156. The Gunkel court distinguished those "imported" products from "property acquired separately... even if the defective product is to be incorporated [with the separately acquired property] for use or resale." Id. Therefore, the court concluded, "property acquired separately from the defective good or service is `other property,' whether or not it is, or is intended to be, incorporated into the same physical object." Id. at 155.
¶ 19 Applying that reasoning here, the houses are separate property from the lots, as JDA conceded at oral argument before this court, therefore a claim for damage to those houses is properly brought in tort. The Gunkel court relied on cases addressing the economic loss rule as applied in product liability cases, not in cases involving construction defects. See id. at 155-56. We agree this analogy is apt; there is no reason to apply the third Salt River factor differently depending on whether the defective product in question is a building, lot, or consumer product. In Sea-Land Service, Inc. v. General Electric Co., 134 F.3d 149, 153 (3d Cir. 1998), the Third Circuit Court of Appeals articulated a test yielding a result consistent with that of Gunkel  the "benefit of the bargain" test. Under that analysis, "every component that was the benefit of the bargain should be integrated into the product; consequently, there is no `other property,'" but "additional parts that are not encompassed in the original bargain but are subsequently acquired ... should not be integrated." See Sea-Land Service, 134 F.3d at 153. (emphasis removed). Regardless of which analysis we use, we reach the same result  the "bargain" in question was Hughes' purchase of the vacant lots and the economic loss doctrine would bar a claim for damages consisting solely of damage to the lots  not to the houses.[7] That the lots were sold in contemplation *872 that houses would be built on them does not alter the analysis.[8]
¶ 20 The gravamen of Hughes' claim is that JDA's negligence in planning and inspecting the dirt fill used in the lots resulted in building sites that were unsuitable for house construction. The defect of concern, therefore, is not in the construction of the Bernstein and Francom houses, but instead the soil upon which those houses were built  which led to damage to other property  the houses. Accordingly, we conclude that the third factor militates strongly in favor of concluding Hughes' claim is brought properly in tort.[9]
¶ 21 The first factor  the nature of the defect causing loss  turns on whether the defect in question poses an unreasonable danger to a person or to property, or whether the defect merely goes to the quality of the construction. See Salt River, 143 Ariz. at 376-77, 694 P.2d at 206-07. Clearly, the defect in the lots that caused their subsidence resulted in extensive damage to property  the houses Hughes built on those lots. Thus, there was a potential  in fact realized  for damage to property due to the defect in the lots. Providing subdivision lots that are unsuitable for construction plainly creates an unreasonable danger to property. See id. at 377, 694 P.2d at 207. And the defect created a danger to the occupants of those houses  the Registrar of Contractors concluded the damage to the Francom house presented a "safety hazard[] to [the Francoms] and their children."
¶ 22 The second factor focuses on the "manner in which the loss occurred," that is, whether the loss resulted from a "sudden accident" or "from a slow process of deterioration." Id. at 377, 694 P.2d at 207. A "sudden calamity or an extraordinary event... ordinarily marks the invocation of tort law, while the commercial code comes into play more readily when a loss is the direct result of the product's early deterioration or other failure to perform in conformity with the commercial agreement." Id. at 378, 694 P.2d at 208. At first blush, this factor appears to weigh in favor of applying contract law. But our supreme court cautioned in Salt River that analysis of this factor "must be approached with a degree of circumspection" because a product's "harmful effects [might] manifest themselves only after a period of many years," and therefore "may pose an unreasonable danger ..., even though no sudden accident has occurred." Id. at 377-78, 694 P.2d at 207-08. In those circumstances, the other factors "assume greater importance and weigh more heavily in the determination of the appropriate rule of law." Id. at 378, 694 P.2d at 208.
¶ 23 Even if we assume, however, that the second factor favors the application of contract law, as we have explained, the first and, particularly, the third factors weigh in favor of applying tort instead of contract law to Hughes' claim. The defects at issue here posed not only an unreasonable risk of harm to persons or property, but also extensively damaged other property  the houses. Accordingly, we conclude that, under the test articulated in Salt River, Hughes' claim is properly brought in tort and the economic loss doctrine does not preclude it.
¶ 24 JDA also asserts that, in light of Flagstaff Affordable Housing and Valley Forge, we should "consider a new balancing *873 test" to determine whether the economic loss doctrine bars "negligence claims against design professionals seeking only economic loss." Specifically, JDA suggests we should consider:
(1) the nature of the relationship between the professional and the claimant; (2) the extent of the duty owed in light of the services the professional agreed to perform; (3) the nature of the harm or damages suffered; and (4) whether the design professional was in the best position to prevent the harm.
¶ 25 Even if we found JDA's proposed test to be sensible, we are not at liberty to adopt it. As we explained in Valley Forge, our supreme court in Salt River defined the factors to consider in applying the economic loss rule. Valley Forge, ___ Ariz. ___, ¶ 7, ___ P.3d at ___. "[W]e may not disregard or modify the law as articulated by the Arizona Supreme Court." State v. Bejarano, 219 Ariz. 518, ¶ 6, 200 P.3d 1015, 1017 (App.2008). In any event, we find no support in Flagstaff Affordable Housing for JDA's proposed test. That case discussed the threshold question of whether the economic loss doctrine should apply to tort claims against a design professional as well as to construction defect or product liability claims. See ___ Ariz. ___, ¶¶ 10-11, ___ P.3d at ___ - ___. Indeed, the court stated the losses asserted in Flagstaff Affordable Housing were purely economic. Id. ¶ 28. As we have explained, we need not reach the question whether the economic loss rule can ever bar claims like the ones made here because the losses Hughes alleges are not purely economic. Thus, based on the factors articulated in Salt River, we conclude the economic loss rule does not bar Hughes' negligence claim and the trial court therefore erred in granting summary judgment on that basis.

Standing
¶ 26 Hughes contends the trial court erred in finding it lacked standing to assert as damages the lost value of the Bernstein and Francom houses. Hughes asserts, as it did below, that it "has demonstrated distinct damages resulting from JDA's negligence" because Hughes is liable to the Francoms and Bernsteins for the damage the soil subsidence caused to their houses. We review de novo whether a party has standing to sue. Aegis of Ariz., L.L.C. v. Town of Marana, 206 Ariz. 557, ¶ 16, 81 P.3d 1016, 1021 (App. 2003).
¶ 27 To establish standing, a plaintiff must demonstrate "a distinct and palpable injury," but "[a]n allegation of generalized harm that is shared alike by all or a large class of citizens" is generally insufficient to do so. Sears v. Hull, 192 Ariz. 65, ¶ 16, 961 P.2d 1013, 1017 (1998); see also Bennett v. Brownlow, 211 Ariz. 193, ¶ 17, 119 P.3d 460, 463 (2005) ("To establish standing, we require that petitioners show a particularized injury to themselves."). The injury may be economic or otherwise. Aegis of Ariz., 206 Ariz. 557, ¶ 18, 81 P.3d at 1021.
¶ 28 JDA does not cite, nor do we find, any authority suggesting that expenses a plaintiff has incurred  or with sufficient certainty will incur  in the course of fulfilling a legal obligation to another party is not a particularized injury sufficient for standing when the legal obligation arose because of the defendant's negligence.[10]Cf. County of Mille Lacs v. Benjamin, 262 F.Supp.2d 990, 997-98 (D.Minn.2003) ("potential liability stemming from a filed complaint can be sufficient to create standing" but not "amorphous threat of future liability"); Seymour v. Holcomb, 7 Misc.3d 530, 790 N.Y.S.2d 858, 862 (N.Y.Sup. Ct.2005) (no standing where party's "contention that it is exposed to potential liability for *874 money damages is unsupported"). Nor do we find authority suggesting that when the third party may have a cause of action against either plaintiff or defendant it must assign its claims to the plaintiff in order for the plaintiff to have standing to sue based on its liability to the third party.
¶ 29 As Hughes has explained, it is not asserting the lost value of the houses as damages on behalf of the Bernsteins or Francoms. Hughes instead seeks its own damages based on Hughes' responsibility to the homeowners for the lost value of and damage to their homes caused by JDA's negligence.[11] This is a sufficient particularized harm to provide Hughes standing to assert as damages the houses' lost value for which it is liable. The questions whether Hughes will be able to prove it is, in fact, liable for the full value of the houses and has compensated  or will have to compensate  the homeowners for that value were not presented by JDA's motion for summary judgment and we do not consider them. See generally Restatement (Second) of Torts § 910 (1979) ("One injured by the tort of another is entitled to recover damages from the other for all harm, past, present and prospective, legally caused by the tort."). Hughes will, of course, have to demonstrate each element of its negligence claim: "the existence of a duty owed, a breach of that duty, and damages causally related to such breach." Smethers v. Campion, 210 Ariz. 167, ¶ 12, 108 P.3d 946, 949 (App.2005).

Disposition
¶ 30 For the reasons stated, we reverse the trial court's grant of summary judgment in favor of JDA on Hughes' negligence claim and its ruling that Hughes lacked standing to bring the damages action. We affirm the trial court's grant of summary judgment on Hughes' implied warranty claim because Hughes has waived that issue on appeal. We remand the case to the trial court for proceedings consistent with this decision.
CONCURRING: PETER J. ECKERSTROM, Presiding Judge and GARYE L. VÁSQUEZ, Judge.
NOTES
[1] It is not entirely clear if, by requesting and signing "findings of fact and conclusions of law," the trial court sought to resolve disputed facts or merely to recite undisputed facts. Of course, the court may not resolve factual disputes in summary judgment, and instead must view the facts and evidence presented in the light most favorable to Hughes. See Sanchez v. City of Tucson, 191 Ariz. 128, ¶ 7, 953 P.2d 168, 170 (1998). We therefore confine our review to the parties' respective statements of facts and any evidence produced in support of those statements.
[2] Based on the economic loss doctrine, the trial court granted summary judgment in favor of JDA on Hughes' claim of negligence and its claim of breach of implied warranty. Hughes appealed from the final judgment "grant[ing] [JDA's] three Motions for Summary Judgment." On appeal, however, Hughes limits its discussion of the economic loss doctrine to its negligence claim. Thus, Hughes has waived its claim of breach of implied warranty and we do not address it. See In re 1996 Nissan Sentra, 201 Ariz. 114, ¶ 15, 32 P.3d 39, 43-44 (App.2001).
[3] In Gipson, the supreme court clarified that "foreseeability is not a factor to be considered by courts when making determinations of duty," and rejected any suggestion to the contrary in Donnelly. Gipson, 214 Ariz. 141, ¶ 15, 150 P.3d at 231.
[4] Flagstaff Affordable Housing distinguished Carstens on the basis that the architect owed a duty of care to the plaintiff, whereas the city inspectors in Carstens did not owe a similar duty. 2009 WL 755285, ¶¶ 27-28. Carstens, in distinguishing Donnelly, questioned whether the plaintiffs in Carstens were in the care of the city inspectors in the same fashion the contractor in Donnelly had been in the care of the defendant site designer because the inspectors in Carstens apparently had made no representations directly to the plaintiffs. 206 Ariz. 123, ¶ 27, 75 P.3d at 1087. The Carstens court also observed that Donnelly was not a negligent construction case because there were no structural defects to remedy. 206 Ariz. 123, ¶ 27, 75 P.3d at 1087. The ruling in Carstens, however, is ultimately grounded on the economic loss doctrine; it recognized the inspectors "may be liable for gross negligence," but concluded that fact did "not mean that the economic loss rule does not limit recovery when no personal injury or damage to other property has resulted." Id. ¶ 28.
[5] Although Salt River was a product liability case, not a construction case, 143 Ariz. at 372, 694 P.2d at 202, we pointed out in Valley Forge that application of the economic loss doctrine in the product liability context "involves the same policy concerns as those present in defective construction cases," and, therefore the same principles apply in both contexts. ___ Ariz. ___, ¶ 9, ___ P.3d at ___; see also Flagstaff Affordable Hous., ___ Ariz. ___, ¶ 10, ___ P.3d at ___.
[6] JDA's analysis of the first and third Salt River factors is anchored in its assertion that "[t]here [wa]s no personal injury or secondary property loss alleged." JDA does not explain or support this conclusory statement and, as we explain, for the purpose of applying the economic loss doctrine, the houses are properly considered to be separate property from the lots.
[7] Courts have reached disparate results in applying the economic loss doctrine in the construction context. Some courts consider damage to other, integrated components as "pecuniary consequential damages barred by [the] economic loss rule," without discussion of either the benefit of the bargain or when  or by whom  those components were added. Burlington Ins. Co. v. United Coatings Mfg. Co., 518 F.Supp.2d 1241, 1254 (D.Haw.2007); see also Weiss v. Polymer Plastics Corp., 21 A.D.3d 1095, 802 N.Y.S.2d 174, 175 (N.Y.App.Div.2005) ("The [economic loss] rule is applicable to economic losses to the product itself as well as consequential damages resulting from the defect."). California, however, has adopted a broader view, determining that "the manufacturer of a defective window installed in a mass-produced home may be held strictly liable in tort for damage that the window's defect causes to other parts of the home in which it is installed." Jimenez v. Superior Court, 29 Cal.4th 473, 127 Cal.Rptr.2d 614, 58 P.3d 450, 457 (2002). We, however, find both the approaches and the results described in Gunkel and Sea-Land Service to be the better reasoned.
[8] We also find significant the United States Supreme Court's analysis in Saratoga Fishing Co. v. J.M. Martinac & Co., 520 U.S. 875, 117 S.Ct. 1783, 138 L.Ed.2d 76 (1997). There, the Court determined that a skiff, fishing net, and spare parts added to a ship were separate property for the purpose of the economic loss doctrine, and thus the plaintiff could recover tort damages for that property when an engine room fire, caused by a faulty hydraulic system, had destroyed the vessel. Id. at 877-78, 884-85, 117 S.Ct. 1783. The court determined that "[i]tems added to the product by the [buyer] are ... `other property.'" Id. at 879, 117 S.Ct. 1783. Similarly, here, the houses Hughes built are items added to the product it purchased  the lots.
[9] The test stated in Carstens essentially reflects the third Salt River factor. Thus, even under Carstens's articulation, the economic loss doctrine would not apply here  the damage to the houses resulting from the inadequate fill is plainly "secondary property damage." Carstens, 206 Ariz. 123, ¶ 10, 75 P.3d at 1083.
[10] JDA relies on comment (a) of § 912 of the Restatement (Second) of Torts (1979), which states:

When one seeks to recover damages for a particular harm that he claims has resulted to his person or to a tangible thing belonging to him, he has the burden of proving that the other has invaded a legally protected interest of his, that he has suffered the harm and that the act of the other was a legal cause of the harm.
But that section of the Restatement discusses the level of certainty required to prove damages and does not suggest that standing in a tort action is limited to harms to the plaintiff's person or to tangible property the plaintiff owns. Standing only requires a particularized injury, economic or otherwise.
[11] We note that it arguably may have been more appropriate for Hughes to file an action against JDA for indemnity or contribution. See A.R.S. § 12-2501 (defining contribution rights between tortfeasors); A.I.D. Ins. Servs. v. Riley, 25 Ariz. App. 132, 136, 541 P.2d 595, 599 (1975) ("The doctrine of indemnity rests upon the proposition that when one is compelled to pay money which in justice another ought to pay, the former may recover of the sums so paid, unless the one making the payment is barred by the wrongful nature of his conduct."). But JDA has not argued Hughes was required to do so in order to assert these damages. Accordingly, we do not address this issue.